**UNITED STATES v. LUSTIG.**

No. 9191.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 19, 1946.

Decided Feb. 10, 1947.

As Amended Feb. 11, 1947.

Edward Halle, of New York City (Carl H. Auerbach, of Camden, N.J., on the brief), for appellant.

Grover C. Richman, Jr., Asst. U. S. Atty., of Camden, N. J. (Edgar H. Rossbach, U. S. Atty., of Newark, N. J., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN, and KALODNER, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The appellant and Thomas E. Reynolds (who does not appeal) were convicted under two joint indictments based on R.S. Sec. 5430, March 4, 1909, c. 321, Sec. 150, 35 Stat. 1116, 18 U.S.C.A. § 264. Counts 1 and 2 of the first indictment charge them with counterfeiting obligations of the United States. Count 3 charges possession of certain materials with the intent to use them for counterfeiting. Both counts of the second indictment charge possession of obligations executed in part after the similitude of obligations of the United States. Appellant was sentenced to five years on the first indictment and three years on the second with the sentences to run consecutively.

Appellant's first point is that the conviction was based on evidence obtained by illegal search and seizure.

Briefly, the facts show that a chambermaid in the Camden, New Jersey, hotel where the appellant and Reynolds were stopping, became suspicious of their actions. She notified the hotel management who in turn notified the city police. As the circumstances indicated a possible violation of currency laws, the police informed Federal Agent Greene. The latter made such investigation as he could at the time and found no evidence of counterfeiting. He then went to police headquarters and so advised Detective Captain Koerner, at which time Greene's official interest in the case ceased. Koerner checked with one Sergeant Murphy regarding the appellant and Reynolds, who was registered under the name of Binstock. After that he went to the hotel himself and checked the register. Following this, based primarily on his independent recollection of Reynolds, alias Binstock, as refreshed by Sergeant Murphy, he obtained warrants for the arrest of both Lustig and Reynolds for alleged violation of a Camden ordinance requiring all criminals in the city over twenty four hours to register with the city authorities. Accompanied by three or four other police officers, Captain Koerner went to the hotel room of Lustig and Reynolds. The latter were not in the room at the time. The police took possession of certain property in the room contained in three brief cases. This consisted of trays, pliers, bond paper, paper cut to actual size of United States currency, various small bottles with liquid in them, tweezers, what appeared to be castors wrapped in cloth, a small piece of sponge, a magnifying glass, a piece of plate glass, a ruler, a cylinder of wood with cloth wrapped around it, an impression of the face of a Federal Reserve note for $100., what appears to be the reverse side of a $100. Federal Reserve note, and an impression of the reverse side of a $10. certificate. Greene, who had remained at headquarters "curious to see what they would find" was telephoned by Koerner after the latter had discovered the above articles and went over to the hotel room. He looked at the various items which by that time were lying on the bed and was satisfied that something was going on concerning counterfeiting. Later Lustig and Reynolds came in and were arrested by Captain Koerner under his city warrant. Captain Koerner testified that Lustig said at the time, "they were not here to pass counterfeit money. They were here to sell the idea how to make it, make an easy living." The next day Agent Greene, after consulting with the Assistant District Attorney, signed a federal complaint against Lustig and Reynolds. The indictments under consideration followed.

It is, of course, thoroughly settled law that evidence obtained through wrongful search and seizure by state officers who are cooperating with federal officials must be excluded. Gambino v. United States, 275 U.S. 310, 314, 48 S.Ct. 137, 72 L.Ed. 293, 52 A.L.R. 1381. So too where the

search has been instigated by federal agents. Crank v. United States, 8 Cir., 61 F.2d 981. And the Fourth Amendment should be liberally construed in favor of the individual. Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746. But mere participation in a state search by a federal officer does not render it a federal undertaking. Byars v. United States, 273 U.S. 28, 32, 47 S.Ct. 248, 250, 71 L.Ed. 520. The last cited case goes on to hold that "We do not question the right of the federal government to avail itself of evidence improperly seized by state officers operating entirely upon their own account."

The present facts do not go as far as those in the Byars decision. Here it is at least questionable from the record that there was any improper seizure by the Camden police. We do not have the benefit of the particular city ordinance other than the reference to it in the testimony. The evidence shows that the Camden police identified Reynolds as a tout or race horse bookie.[1] There is no testimony as to what the conclusion as to Lustig then was, but Lustig on the stand admitted to at least one prior conviction, to a great number of arrests and that he was under bail in New York at the time. Reynolds did not testify. There is nothing in the record to show what happened to the complaint under the municipal ordinance.

The controlling decision in this Circuit is Miller v. United States, 3 Cir., 50 F.2d 505. That case follows the general principles above outlined. The alleged illegal seizure and search concerned an automobile truck loaded with beer. We said, page 507:

"No federal official was present when the state troopers seized the truck. There is no evidence that while federal officers were watching the brewery and state officers were watching the Tallow Factory there was any contact, relation or co-operation between the two forces. Nor is there evidence that when later the state troopers made the search, seizure and arrest there was any co-operation between the two sets of officials. So far as the record shows, each was acting independently of the other all the time. True, the government accepted the benefits of the alleged unlawful search and seizure by accepting the truck and its contents when the troopers delivered them at the government warehouse and by using in evidence the property seized, as it could lawfully do unless the state troopers were acting on its behalf. On this point the state troopers testified that they thought they were enforcing the National Prohibition Law (27 U.S.C.A. § 1 et seq.). But this was merely their personal opinion which alone cannot give a federal character to their action, particularly in view of the fact that Pennsylvania has a state liquor law of its own to be enforced and that the State Constabulary ordered the troopers to this task without any instructions to enforce the federal law. From this evidence we cannot find that the search, seizure and arrest by the state troopers, if unlawful for lack of a warrant and probable cause, were made solely on behalf of the United States or in co-operation with officials of the United States within the meaning of the Gambino decision."

■ From the facts we think it a reasonable conclusion that the search of appellant's room was in truth a proceeding by the state rather than an undertaking of Federal Agent Greene to obtain evidence in a manner forbidden by the federal law while at the same time avoiding the consequences by cooperation with the Camden police. There is no evidence of prearrangement or understanding between Greene and Captain Koerner in the obtaining by the latter of the city warrant and his subsequent search of appellant's room. Greene had frankly advised Koerner that he had found no evidence of counterfeiting. From then on the Camden police executive acted on his own initiative. It is true that Greene took advantage of the results, but, as we see it, in legitimate fashion and within the bounds of the cases covering the subject.

---

[1] Sergeant Murphy testified that he told Captain Koerner, " 'Well, it doesn't seem possible for men in the counterfeiters' racket, counterfeiting money would be in a public hotel.' I said, 'That looks like as there was, and it was possible, but they might be trying to counterfeit race track tickets.' "

See also Sloane v. United States, 10 Cir., 47 F.2d 889; Milburne v. United States, 2 Cir., 77 F.2d 310.

■ ▉ Appellant then argues regarding counts one and two of the first indictment that the evidence proffered to prove the printing of the notes was purely circumstantial, was insufficient and therefore that the Court should have directed a verdict of acquittal on those counts. The chambermaid in the room adjoining that of appellant heard a noise, like glass hitting against glass or metal hitting against metal. As a result she looked through the keyhole of a door entering in Lustig's room. She saw him holding a piece of wet green paper which he tore, giving a piece to Reynolds. It looked like money to her. Then appellant got out a little glass bottle and a little paint brush and laid them down. Then she saw a magnifying glass. She heard one of the men say, "That is enough of them, that is enough of them." Captain Koerner testified that counterfeit money could be made with the equipment he found. An ink expert testified that with phenol, which was among the items found in the room, impressions could be transferred from one paper to another. The impressions of the $100. bills and of the $10. bill above referred to were found in appellant's bag. Lustig, according to Captain Koerner, said that "We are here to make counterfeit money." Clearly the evidence indicated that the jury should pass upon it and just as clearly it supports the verdict upon those particular counts.

Appellant next urges that count three of the first indictment does not state an offense under 18 U.S.C.A. § 264. The relevant portion of the statute reads: "* * * or whoever shall have in his control, custody, or possession any plate, stone, or other thing in any manner made after or in the similitude of any plate, stone, or other thing, from which any such obligation or other security has been printed, with intent to use such plate, stone, or other thing, or to suffer the same to be used in forging or counterfeiting any such obligation or other security, or any part thereof."

▉ It is claimed that none of the articles found in the hotel room come within the requirements of that part of the above language which speaks of possession of "any plate, stone, or other thing." Erickson, Koerner and Greene gave evidence to the effect that the reverse impressions on the paper found in Lustig's room could be transferred to fresh paper in the position which they originally occupied upon genuine currency. Neither Koerner or Greene pretended to know the technical details of such process. Mr. Erickson outlined that process at some length. Admittedly, the United States does not print its obligations by such crude methods. And the interpretation of the statutory "other things" refers to things of the same kind. United States v. Phez Co., 9 Cir., 28 F.2d 106. Nor can the Court extend that genus in a criminal case. United States v. Resnick, 299 U.S. 207, 57 S.Ct. 126, 81 L.Ed. 127.

▉▉ But here the intent of the statute fairly includes all devices by which counterfeit currency may be made. The employment of the terms "plate" and "stone" does not imply that "other things" must be metallic or heavy or elaborate. It means the other things must be capable of the same use. The paper impressions here were testified to as being so capable and the jury accepted that evidence. Whether these impressions could be used to make many counterfeit bills is irrelevant; to make one brings the maker within the express prohibition of the statute.

The offenses charged in the second indictment stem out of that part of Section 264 which reads: "* * * or whoever shall have in his possession or custody, except under authority from the Secretary of the Treasury or other proper officer, any obligation or other security made or executed, in whole or in part, after the similitude of any obligation or other security issued under the authority of the United States, with intent to sell or otherwise use the same; * * * shall be fined not more than $5,000, or imprisoned not more than fifteen years, or both. (R.S. § 5430, Mar. 4, 1909, c. 321, § 150, 35 Stat. 1116.)" (Emphasis supplied).

■ Appellant asserts that the government failed to prove possession of an obligation made and executed "in part" after the similitude of an obligation of the United States. The government evidence on this consisted of the three impressions which have been mentioned. All three were reverse impressions. The first was of the face of a $100. bill; the second of the back of a $100. bill and the third of the back of a $10. bill. It is argued that the offense outlined by the statute contemplates possession of a completely executed obligation similar to an obligation of the United States. Appellant concedes that the proper test to be applied is whether the fraudulent obligation bears such a likeness or resemblance to any of the genuine obligations or securities issued under the authority of the United States as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care when dealing with a person supposed to be upright and honest. This is sound and the sense of the decisions on the point. United States v. Weber, D.C., 210 F. 973, 976; Minnella v. United States, 8 Cir., 44 F.2d 48, 49.

This question was developed very thoroughly by the defense on cross examination of Federal Agent Greene. The latter said he had been such agent since 1933 and had handled counterfeiting cases since that time, the particularly heavy period for such matters having been from 1933 to 1937. For about five years he was part of a special federal educational program, giving lectures to bankers and others in connection with how counterfeit money is made, how it is sold, how it is devised and how it is detected. He said that the three impressions were reasonable facsimiles of the bills which they were intended to imitate. He further said that the impressions are such a likeness or resemblance to United States currency as to be calculated to deceive an honest, sensible and unsuspecting man of ordinary care and observation.[2]

■ In addition to this testimony brought out by the defense, the three impressions had been received in evidence without objection by the defense on this phase of the matter. Nor was there any motion or request to charge in connection with this particular question. Defendant suggests that the Trial Court should have set the verdict aside with reference to the second indictment as against the weight of the evidence. Tested by the rule outlined by the defendant, we think that whether the three impressions were in whole or in part after the similitude of any obligation of the United States was peculiarly a jury question under the facts of this case.

We have carefully examined the other contentions of the appellant and find them without merit.

Affirmed.

---

[2] In explaining his reasons for his opinion this witness stated that:.

"According to our experience with Secret Service, I have obtained from business men a split ten dollar bill, that is the back of a ten dollar bill that was passed in this manner, it would be folded, you understand. A man could sit in a car and order a dollar's worth of gas, and after the materials had been delivered to the car and the change given before the gas station attendant could see the ten dollar bill.

\* \* \* \* \* \* \*

"This man held the ten dollar bill. He held it folded so the gas station attendant saw the numeral ten, the gas station attendant handed out nine dollars, the passer took it and the car left, and by the time the gas station attendant unfolded the bill, the car was gone. That was one type of them. We had a number of instances. Another, we have received from victims play money. You have heard of United States stage money, the exact size of genuine money. Whenever we run across that we confiscate it. Play money looks like real money because it is the actual size and color of it. In the light of those circumstances, I would say yes to Mr. Auerbach's question."