**Harry S. STONEHILL and Robert P. Brooks, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 22346.**

United States Court of Appeals Ninth Circuit.

Dec. 9, 1968.

Rehearing Denied Feb. 4, 1969.

Bertram H. Ross (argued), Los Angeles, Cal., Trammel, Rand & Nathan, Washington, D. C., for appellants.

John J. McCarthy (argued), Lee A. Jackson, Joseph M. Howard, Jerome H. Fridkin, Dept. of Justice, Mitchell Rogovin, Asst. Atty. Gen., Washington, D. C., Wm. M. Byrne, U. S. Atty., Loyal E. Keir, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS and BROWNING, Circuit Judges, and * BELLONI, District Judge.

BELLONI, District Judge.

This appeal [1] is from an interlocutory order of the United States District Court for the Central District of California which denied appellants' motion to suppress evidence in a civil action brought by the United States of America.

The United States, in January, 1965, filed a complaint seeking foreclosure of Federal tax liens securing Federal income tax liabilities outstanding against

---

* Hon. Robert C. Belloni, United States District Judge, District of Oregon, sitting by designation.

1. Pursuant to 28 U.S.C. § 1292(b).

Harry S. Stonehill and Robert P. Brooks for 1958 through 1961, inclusive. Taxpayers (appellants Stonehill and Brooks) moved to suppress certain evidence they claimed had been obtained in violation of taxpayers' Constitutional rights.

The trial court held a hearing on the motion, later entering its written order and opinion denying the motion to suppress. United States v. Stonehill, 274 F.Supp. 420. Subsequently, the trial court granted a certificate under 28 U.S.C. § 1292(b); taxpayers then petitioned for and were granted permission from this court to appeal from the order.

The question before this court is whether the district court erred in denying taxpayers' motion to suppress. Taxpayers contend that the documents in question should have been suppressed as evidence even if seized by foreign officers in a foreign country, because the searches and seizures were illegal by United States Constitutional standards (in violation of the Fourth Amendment). Taxpayers contend also that the district court erred in concluding that the action of United States agents did not constitute United States "participation" in the illegal searches and seizures. We find no merit to these contentions and affirm the district court's order.[2]

## STATEMENT OF FACTS

Taxpayers' motion seeks to suppress numerous documents seized in the Philippines during raids which began March 3, 1962. Better understanding of the issues, however, requires that we examine events which took place over a period of several years. During the tax years in question, taxpayers Stonehill and Brooks were American citizens residing in the Philippines. The tax investigation on which the assessments are based had its inception in the Philippine Islands.

Stonehill and Brooks began business together in the Philippines shortly after World War II and developed a substantial number of businesses, including the United States Tobacco Company. They were officers of, or controlled, many successful corporations. As the district court so aptly stated:

"So eminently successful were they in ascending the ladder of finance that they brought themselves and their activities to the attention of the Philippine authorities and to the attention of the United States Internal Revenue Service." 274 F.Supp. at p. 421.

Robert Chandler was attached to the United States Embassy in Manila as the Internal Revenue Service representative for the Far East. His duties included auditing returns of and collecting taxes from American taxpayers residing in his territory. In 1960, the income tax return of Harry S. Stonehill for the calendar year 1958 was sent to Chandler for audit. Due to lack of personnel, the audit was not conducted. Nothing further was done.

Menhart Spielman had been vice-president of United States Tobacco Company until his discharge by Stonehill and Brooks; before leaving the tobacco company he copied and photographed certain documents and records which he felt disclosed wrongdoing on the part of taxpayers. In December, 1961, Spielman contacted Robert Hawley, a Federal Bureau of Investigation agent attached to the American Embassy in Manila, who in turn directed him to Chandler.

After Chandler met Spielman on December 18, 1961, he concluded that Spielman's information indicated possible tax liabilities due from the taxpayers and that the information might be of interest to the Philippine authorities. On December 22, 1961, Chandler relayed Spielman's information to his office in Washington, D. C., also telling them that

---

2. Our finding that there was no participation by Federal agents makes it unnecessary to decide other issues raised, i. e., the taxpayers' standing as to suppression of corporate documents, whether the evidence could be used for purposes of impeachment, and whether the exclusionary rule applies to civil cases.

any tax investigation was beyond his office's capabilities, and recommending that additional agents be assigned. Chandler spent considerable time with Spielman collecting information, repeatedly asking his headquarters for assistance.

Chandler and Hawley finally persuaded Spielman to meet with the Philippine authorities; on January 27, 1962, Spielman met with Colonel Lukban, who was in charge of the Philippine National Bureau of Investigation. For some time prior to this meeting, the Philippine National Bureau of Investigation (NBI) had been investigating Stonehill and Brooks, gathering evidence which they hoped to use in deporting Stonehill and Brooks from the Philippines as undesirable aliens.

Philippine authorities, as part of their deportation investigation, decided to raid the taxpayers' business premises. Upon learning of the proposed raids, Robert Chandler objected, requesting that such action not be taken or that it at least be postponed. His request was disregarded. Philippine authorities began planning the raids, and because Chandler and Col. Lukban were friends, some of the numerous preparation meetings were held in Chandler's home. Because Spielman was afraid to go to NBI headquarters, meetings between Spielman and the NBI were also held in Chandler's home.

Chandler did not assist in planning the raids, although at one NBI meeting when Chandler was present he did ask if the Army-Navy Club was included on the list of premises to be raided. The information furnished Chandler and the NBI by Spielman was the basis for this question. Chandler suggested including this building; when the raids were conducted it was included.

Under the supervision of Col. Lukban and Jose Diokno (the then-Secretary of Justice for the Republic of the Philippines), the NBI made all the preparations for these raids. In the process of relaying information from Spielman, a diagram prepared by Chandler of one premises and a memorandum prepared by him on another inadvertently fell into the hands of the NBI. They were not intended as directions to the NBI.

The night before the raids Chandler was called to Col. Lukban's home. A large number of NBI personnel were also present. Chandler was shown a paper described as a warrant and was asked for his comment. He said he knew nothing about search warrants but that the copy appeared to be all right. At this point Chandler made his inquiry about the Army-Navy Club.

After the Philippine authorities decided to conduct the raids, but prior to the raids, Chandler secured permission from Col. Lukban to examine and copy records seized in the raids. However, it is clear that the purpose of the raids was to uncover violations of Philippine law, not to obtain evidence for the United States agents.

The raids on the taxpayers and their corporations commenced Saturday, March 3, 1962, at about 1:00 P.M., at which time the taxpayers were arrested and 200 NBI agents simultaneously raided the business offices of the taxpayers and some 17 different corporations. The NBI took possession of the various corporate premises and began to gather the voluminous documents and records seized in the raids, a process which took from several hours at some locations to several days at others.

When the raids started, Robert Chandler and two agents from his office went to a small temporary structure owned by the NBI across the street from NBI headquarters to wait for the conclusion of the raids, hoping to obtain from the NBI any records which were seized. They remained there all afternoon, and at about 5:00 P.M. read in the evening paper that the taxpayers had been arrested and their various businesses raided, which lead them to believe the raids were completed. About 10:00 P.M. that evening, Col. Lukban asked them to come to his office. There

they saw a large volume of records and documents which had been seized in the raids and requested permission to copy or photograph some of them. The request was denied, Col. Lukban indicating that the seized records and documents would not be made available until they had been examined, catalogued, and inventoried by the NBI. The next day arrangements were made to permit Robert Chandler to photograph or copy some of the documents.

While Chandler and his associates were in Col. Lukban's office, an NBI agent requested the assistance of an accountant to determine which records, from a large number seized in a warehouse of the United States Tobacco Company, were significant; there were too many to bring to NBI headquarters and the NBI agent did not know what to pick up. Col. Lukban asked Chandler to go to the warehouse to help the NBI agent. Chandler agreed. Chandler and two associates went to the warehouse, pointed out the books and records which appeared to be the most significant from an accounting point of view, and left. They made no detailed examination of the records, took no records with them, and did not know what was done with these records after they left.

Chandler drove from the warehouse to the main office of the United States Tobacco Company, several blocks away, and asked the NBI agent in charge if they had found the record storage room Spiel-

man had told both Chandler and the NBI about. The NBI agent did not seem to know about it and asked Chandler to point it out. Chandler stepped into the office, pointed out generally the location of the record storage area, and left. He was only on the premises about five minutes and did not enter the room or examine any records.

On March 5, 1962, some, but not all, of the seized records were made available to United States agents for the first time. After an examination of these records, the Internal Revenue Service opened a fraud investigation of the taxpayers, ultimately resulting in the jeopardy assessments which are the basis of this suit.

## OPINION

■■ After a lengthy hearing on the motion to suppress these documents, the district judge entered his written opinion (274 F.Supp. 420), which found as facts most of the foregoing. We are bound by his findings unless they are clearly erroneous. We believe, as a result of our review of the ten-volume transcript and exhibits, that the foregoing narrative is a fair statement of the events. It includes some facts not found by the district judge, but contains nothing in conflict with them. Indeed, we find no conflict between the district judge's findings and the record, although appellants take emphatic objection to some of the findings and believe other events [3] are material and consti-

3. For example, Secretary Diokno flew to Hong Kong on February 11, 1962 and saw an aide of Attorney General Kennedy, a Mr. Seigenthaler. At this meeting, Secretary Diokno requested help of the United States in investigating the taxpayers; specifically, he requested that the services of some tobacco experts be made available to him in investigating the activity of the taxpayers' Philippine tobacco companies. No help was requested of Secretary Diokno by the United States at this meeting, or by Mr. Chandler at any meeting. Further, Secretary Diokno has admitted that the help he requested of the United States was never provided. Around the time of the Hong Kong trip, Secretary Diokno decided to have the taxpayers arrested and their companies' business premises raided in connection with the NBI's investigation.

Appellants also rely on a copy of a memorandum sent January 10, 1962 from the Revenue Service representative in Manila to the office of International Operations in Washington, D. C., as indicating U. S. participation in the March raids. (Defendants' Ex. E.) This document only reaffirms the U. S. position prior to the raids of being interested but not yet ready to take any action.

We do not think that either the visit to Mr. Kennedy's assistant nor the impeaching document aids appellants' position.

tute evidence of sufficient involvement to prove that the United States agents instigated the raids. We do not agree.

The raids were found to have been illegal searches and seizures by the Philippine Supreme Court as violating a section of the Philippine Constitution which is identical to our Fourth Amendment. The search warrants were defective because no *specific* offense had been alleged. 274 F.Supp. at p. 424. If the raids had been conducted by United States agents, they would have been illegal under our Constitution.

■ Neither the Fourth Amendment of the United States Constitution nor the exclusionary rule of evidence, designed to deter Federal officers from violating the Fourth Amendment, is applicable to the acts of foreign officials. Brulay v. United States, 383 F.2d 345 (9th Cir. 1967). The reasoning for this is:

1) all relevant evidence is admissible unless there is an exclusionary rule;

2) even the Fourth Amendment does not by itself provide for exclusion of evidence unlawfully obtained;

3) the Supreme Court, in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), in order to force United States officers to abide by the Fourth Amendment, created the exclusionary rule;

4) there is nothing our courts can do that will require foreign officers to abide by our Constitution.

■ Thus, the Fourth Amendment could apply to raids by foreign officials only if Federal agents so substantially participated in the raids so as to convert them into joint ventures between the United States and the foreign officials. Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927); Lustig v. United States, 338 U.S. 74, 69 S. Ct. 1372, 93 L.Ed. 1819 (1949); Symons v. United States, 178 F.2d 615 (9th Cir. 1949); Sloane v. United States, 47 F.2d 889 (10th Cir. 1931).

Prior to the decisions of the Supreme Court in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933 (1961) and Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), wherein the Supreme Court held that the Fourth Amendment was incorporated in the Fourteenth Amendment and therefore applicable to State agencies, it was pertinent to inquire whether Federal officials so substantially participated in a raid by State officials so as to convert the raid into a joint venture between State and Federal officials and therefore subject to the provisions of the Fourth Amendment. The essentials of that inquiry are equally pertinent in determining whether Federal officials so substantially participated in a raid by foreign officials as to convert that raid into a joint venture between the United States and the foreign government and therefore subject to the provisions and sanctions of the Fourth Amendment.

In all reported Federal cases holding a search to be a Federal search, the participation by Federal officers has been far more extensive than here. The Supreme Court, in Byars v. United States, supra, held that a State search and seizure was the act of the United States and violated the Fourth Amendment because of the substantial participation in the search and seizure by a Federal agent. State officers, on their way to execute a search warrant, asked a Federal prohibition agent (Adams) to accompany them. Upon arriving at the premises to be searched, each of the officers, including Adams, was assigned a room to search and the search was conducted under the authority of the State warrant. Adams searched the kitchen and found some stamps (counterfeit strip stamps of the type used on whiskey bottled in bond), and a State officer also found stamps in another room. Adams kept the stamps he found, and, because they did not represent a violation of any State laws, the State officer turned over the other stamps to Adams. The court found that Adams

participated as a Federal enforcement officer on the chance that something would be disclosed of official interest to him as such agent. This substantial participation by Adams was found to be under color of his Federal office and the search, in substance and effect, a joint operation of the local and Federal officers. The court (273 U.S. at p. 33, 47 S.Ct. at 250) stated:

> "The effect is the same as though he had engaged in the undertaking as one exclusively his own."

Emphasizing the fact that mere participation by a Federal officer would not render a search a Federal undertaking, the court, at p. 32, at p. 249 of 47 S.Ct. stated:

> " * * * the court must be vigilant to scrutinize the attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods."

The court also noted, at p. 33, at p. 250 of 47 S.Ct.:

> "Similar questions have been presented in a variety of forms * * * each of them rests, as the present case does, upon its own peculiar facts * * *."

The acts of participation must be such that the search and seizure can be said to be a joint operation or joint venture between the United States and the State or foreign government. Whether the search does become a joint venture can be determined only by a comparison of what the Federal agent did in the search and seizure with the totality of acts done in the search and seizure. In Byars, the court concluded that the only reason a Federal agent was present at the time of the raid was to select that evidence which was subsequently introduced in the Federal prosecution. Further, the Federal agent selected certain evidence according to the sole criterion of its use in a Federal prosecution, and he kept exclusive possession of this evidence at all times.

Subsequently, the Supreme Court reaffirmed the Byars doctrine in Lustig

v. United States, supra. In Lustig, Secret Service Agent Greene had reason to suspect two defendants of violations of the counterfeiting statutes, but, upon looking through the keyhole of the suspects' room, could see no evidence of any violation and reported this fact to the local police. Greene also told the local police that he was "confident that something was going on." The local police secured arrest warrants alleging violations of State law and went to the hotel room to make the arrests. The defendants were not in the room; the police searched the room and discovered evidence which indicated counterfeiting of currency. The local police then called Greene, who had remained at police headquarters because he was "curious to see what they would find." Greene went to the hotel room and examined the items discovered by the local police. Upon returning, the defendants were arrested and searched, with Greene inspecting the items found in their pockets. Some of the articles seized were given to Greene before he left the room, and all were eventually turned over to him. On these facts the Supreme Court found participation on the part of the Federal agent, stating:

> "So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it." 338 U.S. at p. 79, 69 S.Ct. at p. 1374.

The court was of the opinion that Greene's activities were not severable and were therefore part of the search carried on in the room. The court in Lustig held that to differentiate in participation from the beginning and joining a search before it had run its course would be to draw too fine a line in the application of the Byars doctrine. Greene went to the hotel room hoping to find evidence which could be used in a Federal prosecution, he and the State officers concerned themselves especially with turning up evidence of violations of the Federal counterfeiting laws, and the articles seized were either taken by or were turned over to the Federal agent

during the search. Greene clearly participated in his capacity as a Federal agent and was searching for possible Federal violations.

Corngold v. United States, 367 F.2d 1 (9th Cir. 1966), is another case where the action of a Federal agent was held to be Federal participation. In *Corngold*, a package was delivered to an airline in Los Angeles for shipment to New York. A Federal customs agent suspected the package contained contraband and so informed an airline employee. The customs agent instigated and participated in the opening and inspecting of the package without a search warrant. A divided court held this to be an illegal search and seizure (because of the failure to obtain a search warrant), finding that the customs agent and the airline employee had been engaged in a joint operation and the Federal participation would prevent the evidence from being admissible in Federal court. This court, relying on the *Byars* doctrine, stated:

> "When a federal agent participates in such a joint endeavor 'the effect is the same as though he had engaged in the undertaking as one exclusively his own.'" 367 F.2d at p. 6.

In *Corngold*, the airline employee would not have conducted a search but for the insistence of the Federal agent, and even then he did so reluctantly.

The above cases, by applying the exclusionary rule, found participation by Federal agents. The *Byars* doctrine clearly requires that the participation question be determined by a thorough examination of the facts of each case.

Brulay v. United States, 383 F.2d 345 (9th Cir. 1967), is a recent opinion of this court which was discussed and relied upon by the trial court here. Mexican authorities arrested Brulay and seized evidence. The Tijuana municipal policemen had stopped Brulay because the car he was driving looked heavy in the rear, and arrested him because he appeared to be nervous. After arresting him, they discovered 300 pounds of amphetamine tablets in the trunk. Although United States Customs had previously alerted Mexican Federal Police to the defendant's activities, the court found no United States participation in the arrest or seizure, and, further, that the actions of the Mexican officers had not been instigated by United States Customs or Narcotics officials. The court held that the seized tablets were properly admitted.

In Birdsell v. United States, 346 F.2d 775 (5th Cir. 1965), cert. denied 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366, Birdsell objected to evidence allegedly obtained in violation of the Fourth Amendment. The arrest and seizure were made in Mexico by Mexican officials, without participation by United States agents. A Texas deputy sheriff who happened to be passing through town did assist the Mexican authorities by acting as an interpreter. The court held the evidence to have been properly admitted, stating:

> "* * * the Fourth Amendment does not apply to arrests and searches made by Mexican officials in Mexico for violation of Mexican law, even if the persons arrested are Americans and American police officers gave information leading to the arrest and search." 346 F.2d at p. 782.

In a footnote in the *Birdsell* opinion, the court indicated that if Federal officials induced foreign police to engage in conduct which shocked the conscience, then a Federal court *might*, in the exercise of its supervisory powers, refuse to allow the prosecution to enjoy the fruits of such action. The court noted that *Birdsell* was not such a case; neither is the instant case.

In Sloane v. United States, supra, a Federal prohibition agent gave information obtained from an informant (concerning the location of a still) to a deputy sheriff. State officers obtained a search warrant, searched the premises, and seized evidence incriminating Sloane. The evidence was later turned over to the Federal agent for prosecution in Federal court. Sloane's motion to suppress the

evidence was denied. The court stated that a Federal agent must not be permitted to do indirectly that which he cannot do directly, and thus circumvent the provisions of the Fourth Amendment against unreasonable search and seizure. However, in *Sloane* the court held that the Federal agent neither ordered nor directed the search, that there was no Federal participation, and the motion to suppress was properly denied.

Other cases dealing with the "participation" question deserve brief mention. In Shurman v. United States, 219 F.2d 282 (5th Cir. 1955), a Federal narcotics officer informed a State officer he believed Shurman's car contained narcotics. He did not request any action on the part of the State officer, merely gave the information. The State officer arrested Shurman, found narcotics in the car, and ultimately the case was turned over to Federal authorities for prosecution. The court, although finding that the search was illegal for lack of a warrant, admitted the evidence because no participation by Federal officers, or such cooperation between Federal and State authorities as to prevent the use of the evidence, was shown. Clearly, the giving of information, without more, does not amount to participation or make a later search a joint venture.

In Symons v. United States, supra, Federal agents who arrived several hours after an initial search and seizure by State officers and took charge of the evidence (narcotics), were held not to have participated in the arrest or in the search and seizure. The casual presence of a Federal officer at the scene of a search is not sufficient to make the Federal officer a participant under the *Byars* doctrine.

United States v. Brown, 151 F.Supp. 441 (E.D.Va.1957). In *Brown,* a Federal officer inadvertently arrived at the scene of a State search, having come to the address on another matter. Also see Myers v. United States, 49 F.2d 230 (4th Cir. 1931), and United States v. Evans, 179 F.Supp. 834 (D.Md.1960).

The facts of the case at hand require it to be placed in the category of cases holding that Federal officers did not undertake or unlawfully participate in an unconstitutional search and seizure. The principal factors leading to that conclusion are:

1) No United States agent selected any evidence for use in a United States investigation or prosecution—nor for that matter did any Philippine officer on their behalf. On the contrary, the raids were instigated and planned by Philippine officers before United States agents became involved; the sole purpose of the raids was to obtain evidence for Philippine proceedings.

2) All activities of United States agents in connection with the raids took place before the raids commenced or after their termination.

3) Only after the raids were completed and the documents catalogued were the United States agents given permission to copy documents, if any, which might be of interest to them.

4) There is no evidence that any United States agents were attempting to shortcircuit the Fourth Amendment rights of the taxpayers, as proscribed in the language of the *Byars* case ("by circuitous and indirect methods.")

5) The United States agents clearly objected to the raids, asking that the raids either not take place or at least that they be postponed.

6) When the United States agents made Spielman's information available to the Philippine authorities, they were not requesting any action whatsoever, much less instigating an unlawful search. It should also be noted that the search was illegal due to defective search warrants; which, properly prepared, might have satisfied Constitutional requirements.

Since United States officials did not participate in the unlawful search, but rather obtained the contested evidence in a lawful manner, the denial of the motion to suppress was proper and the interlocutory order of the District Court is affirmed.

BROWNING, Circuit Judge (dissenting):

Contrary to the impression left by the majority, the evidence which it holds admissible was obtained by searches and seizures which flagrantly violated basic provisions of the Philippine Constitution borrowed directly from the Fourth Amendment.[1] The warrants were not issued "upon probable cause."[2] Moreover, they were general warrants, containing no language "particularly describing the * * * things to be seized."[3] In suppressing the evidence the Supreme Court of the Philippines said, "To uphold the validity of the warrants in question would be to wipe out completely one of the most fundamental rights guaranteed in our Constitution. * * *" Stonehill v. Diokno, 20 Phil. Sup.Ct.Rpts.Ann. 383, 392 (1967).[4] It is clear that the raids would be equally lawless under the Fourth Amendment.[5]

The majority concludes that the evidence is nonetheless admissible in federal court because it was seized by foreign officials, to whom the Fourth Amendment does not apply,[6] and was turned over to United States agents "on a silver platter." Lustig v. United States, 338 U.S. 74, 79, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949).

Under the "silver platter" doctrine, evidence seized by state officers in violation of Fourth Amendment standards was, until the decision of Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L. Ed.2d 1669 (1960),[7] admissible in a federal trial court unless the purpose of the search was to obtain evidence of a federal offense (Gambino v. United States, 275 U.S. 310, 48 S.Ct. 137, 72

1. Phil.Const. Art. III, § 1(3).

2. The applications for the warrants stated that the articles to be seized "are being used or intended to be used in the commission of a felony, to wit: Violation of the Central Bank Laws, Tariff and Customs Laws, Internal Revenue Code and the Revised Penal Code" (a description covering about 1,000 offenses), and that the place to be searched "has been observed to be the meeting place or accommodation office where various individuals meet in connection with illegal transactions for the purpose of defrauding the government." A few added that "the same has also been observed as the place where illegally imported cigarette papers are being cut and kept with the Chambon Slitter Machine."

As the Supreme Court of the Philippines held, "it was impossible for the judges who issued the warrants to have found the existence of probable cause," for there was no showing that the parties against whom the warrants were sought had "performed particular acts, or committed specific omissions, violating a given provision of our criminal laws. As a matter of fact, the applications involved in this case do not allege any specific acts * * *." Stonehill v. Diokno, 20 Phil. Sup.Ct.Rpts.Ann. 383, 391–92 (1967).

3. The warrants authorized the seizure at each of the 32 premises raided of all "documents and/or papers showing all business transactions."

The Philippine Supreme Court condemned this sweeping authorization as "openly contravening the explicit command of our Bills of Rights—that the things to be seized be particularly described—as well as tending to defeat its major objective: the elimination of general warrants." 20 Phil.Sup.Ct.Rpts.Ann. at 393.

4. The sweeping and indiscriminate manner in which the warrants were executed sustains the court's judgment. Two hundred agents of the Philippine National Bureau of Investigation occupied 32 separate premises, rummaged through private and business files for more than 12 hours, and trucked away thousands of documents.

5. See, e.g., Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); Marron v. United States, 275 U.S. 192, 195–196, 48 S.Ct. 74, 72 L.Ed. 231 (1927); Boyd v. United States, 116 U.S. 616, 624–630, 6 S.Ct. 524, 29 L.Ed. 746 (1886); Saylor v. United States, 374 F. 2d 894, 898, 179 Ct.Cl. 151 (1967); Powell v. Zuckert, 125 U.S.App.D.C. 55, 366 F.2d 634, 640 (1966).

6. Brulay v. United States, 383 F.2d 345, 348 (9th Cir. 1967); Birdsell v. United States, 346 F.2d 775, 782 (5th Cir. 1965).

7. In Elkins, the Court, relying on its supervisory power over the administration of criminal justice in federal courts, held that any evidence illegally seized by state officers is inadmissible in a federal prosecution.

L.Ed. 293, 52 A.L.R. 1381 (1927)); or unless federal officers participated in the search. Lustig v. United States, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927).

Assuming that the "silver platter" doctrine governs this case,[8] it is misapplied by the majority.

As will be noted in greater detail later, the district court made no finding as to the *purpose* of the raids; the applicability of the *Gambino* rule to this case therefore cannot be determined on the present record.

In dealing with the issue of American *participation* in the raids, the majority has resurrected a misconception regarding this aspect of the "silver platter" doctrine which the Supreme Court laid to rest in Lustig v. United States, supra.

The majority repeatedly asserts the view that the evidence here is admissible unless the federal agents so substantially participated in the raids as to convert them into "joint ventures" between the United States and Philippine officials. In short, the majority holds that federal officers may participate in undertakings violative of Fourth Amendment standards so long as they do not participate too much.

This view is apparently derived from a misreading of Byars v. United States, 273 U.S. 28, 47 S.Ct. 248 (1927). There, the Court held that the Fourth Amendment applied where "the search in substance and effect was a joint operation of the local and federal officers." 273 U.S. at 33, 47 S.Ct. at 250. But the quoted language is simply a description of the facts in *Byars,* not a formulation of the general standard to be applied in determining the applicability of the Fourth Amendment in all cases.[9] If this was not clear in *Byars* itself, the Supreme Court made it so in *Lustig.*

The sole issue in *Lustig* was the interpretation and application of *Byars,* which the Third Circuit had read as the majority of this court reads it.[10] Reversing, Mr. Justice Frankfurter said:

"The crux of [the *Byars*] * * * doctrine is that a search is a search

---

8. It may be argued that *Elkins* requires suppression of evidence in a federal court whenever the evidence was seized in a search which would have violated the Fourth Amendment if conducted by federal officials. In Brulay v. United States, 383 F.2d 345 (9th Cir. 1967), though, we rejected this result when dealing with a search conducted by foreign officials. It has been said that *Brulay* considered only the deterrence rationale of the exclusionary rule and that the result there was inconsistent with other bases for the rule. See Ninth Circuit Review, 10 Ariz.L.Rev. 235, 273–74 (1968); 53 Cornell L.Rev. 886, 892–896 (1968); 46 Texas L.Rev. 791, 793–95 (1968). It may also be that *Brulay* should not be applied where, as here, the search violated local law as well as Fourth Amendment standards.

9. The same is true of the similar language in Corngold v. United States, 367 F.2d 1, 6 (9th Cir. 1966). We went on to adopt the rule in Lustig v. United States, quoted hereinafter.

10. Like the majority, the Third Circuit relied on the statement in *Byars* that *"mere* participation in a state search of one who is a federal officer does not render it a federal undertaking." 273 U.S. at

32, 47 S.Ct. at 249. See United States v. Lustig, 159 F.2d 798, 800 (3d Cir. 1947). In context, this statement means only that participation in a state search by a federal officer does not make the enterprise a federal undertaking *if the federal officer was not acting as such.* The next paragraph of the *Byars* opinion begins:

"The attendant facts here reasonably suggest that the federal prohibition agent was not invited to join the state squad *as a private person* might have been, but was asked to participate and did participate *as a federal enforcement officer,* upon the chance, which was subsequently realized, that something would be disclosed of *official interest to him as such agent.*" 273 U.S. at 32, 47 S.Ct. at 249 (emphasis added).
The Court went on to say:

"We do not question the right of the federal government to avail itself of evidence improperly seized by state officers operating entirely upon their own account. But the rule is otherwise *when the federal government itself, acting through its agents as such,* participates in the wrongful search and seizure." 273 U.S. at 33, 47 S.Ct. at 250 (emphasis added).

by a federal official *if he had a hand in it* \* \* \*. The decisive factor in determining the applicability of the *Byars* case is the actuality of *a share by a federal officer* in the total enterprise of securing and selecting evidence by other than sanctioned means. \* \* \* *So long as he was in it* before the object of the search was completely accomplished, *he must be deemed to have participated in it."* 338 U.S. at 78–79, 69 S.Ct. at 1374 (emphasis added).

Justice Frankfurter later explained that under the doctrine, the "question has always been whether the offending search or seizure was conducted *in any part* by federal officers or in the interest of the Federal Government, or whether it was conducted *solely* by state officers acting exclusively for state purposes." 364 U.S. at 236, 80 S.Ct. at 1455 (emphasis added).[11]

The inquiry must focus on what the *federal officers did,* since only they are subject to the Fourth Amendment.[12] If the raids were conducted in part by federal officials, acting as such, the evidence seized must be excluded. This is the legal standard, and not whether the search or seizure was a "joint operation" —a conception to which there is no reference in *Lustig.*[13]

Accepting the findings of the district court, as supplemented by the majority of this court,[14] the American agents contributed to the unlawful enterprise in at least these respects: They brought Spielman and his information [15] to the attention of the Philippine authorities, and, as the majority finds, "finally persuaded" Spielman to meet with them. Chandler made his home available to the NBI for meetings with Spielman, and for the "planning" and "preparation" of the raids. Chandler attended these meetings.[16] In the course of "relaying in-

11. Justice Frankfurter was dissenting from the Court's rejection of the "silver platter" doctrine. The *Elkins* majority did not quarrel with Justice Frankfurter's statement of the true limits of that doctrine.

See also Euziere v. United States, 266 F.2d 88, 90 (10th Cir. 1959): "The test in all cases is did the federal authorities participate *in any way* in the search?" (emphasis added).

12. This is the premise of the *Brulay* and *Birdsell* decisions, note 6, supra, upon which the majority relies.

13. Little is to be gained from the kind of case-by-case factual comparisons the majority has undertaken since each case must be determined on its own facts. Byars v. United States, 273 U.S. 28, 33, 47 S.Ct. 248 (1927). Moreover, it is evident from the majority's recitations that in those lower court cases in which no participation was found, there was less federal involvement than is present here, even assuming that those decisions faithfully reflected the Supreme Court holdings in *Byars* and *Lustig.* It has been pointed out that niggardly and reluctant administration of the *Byars-Lustig* rule by some lower courts imposed impossible evidentiary burdens (even more formidable in a foreign search) upon the victims of searches and seizures, and tempted federal

and state officials to collusion and deceit. Kamisar, Wolf and Lustig Ten Years Later, 43 Minn.L.Rev. 1083, 1165–96 (1959). The inevitable consequence was the holding in *Elkins* that evidence unconstitutionally seized by state officers must be excluded from federal prosecutions without regard to whether federal officers participated in any way.

14. As will be noted later, the district court made no findings with respect to some of these occurrences, and made materially different findings than the *majority* of this court does with respect to others. The majority's version, however, reflects the minimum participation by American agents which could be justified by the evidence, and is therefore accepted for the purposes of the argument here.

15. The value of Spielman's information was reflected in Chandler's statement that without it the Philippine authorities had nothing.

16. Chandler testified that 10 or 12 meetings were held, and that he attended "most" of them. Chandler described his role in these meetings as that of a "mediator" between Spielman and the NBI agents, and testified that he tried "to express [to the NBI] what Spielman was trying to tell them." During this period Chandler, who had been assigned an NBI

formation" from Spielman to the NBI, Chandler prepared a diagram and a memorandum of two of the premises to be raided.[17] Chandler suggested an additional location to be raided; and his suggestion was adopted.[18] Chandler, prior to the raids, "secured permission from Colonel Lukban to examine and copy records seized in the raids." After the raids had begun, Chandler and his two assistants, at Colonel Lukban's request, went to one of the premises being searched, and "pointed out" the "significant" books and records to be seized.[19] From this search location the three American agents, on their own initiative, went to another. There Chandler inquired whether the NBI agents had found a records storage room which Spielman had mentioned, and upon discovering that they had not, Chandler pointed out the location of the storage room to the NBI agent in charge.[20]

liaison, also met with officials of the NBI in their offices and his own, sometimes once or twice a day. Chandler testified that all of these meetings concerned the investigation of appellants' affairs; and that among the matters discussed was "the location of documents and records in the premises which were going to be raided."

17. On their face, these documents disclose detailed information as to places to be searched and things to be seized. Chandler identiifed much of the writing as his own. Chandler testified that these documents were "probably" prepared and given to Spielman to assist the latter in transmitting the information they contained to the NBI and that he presumed that this information "would probably be used in the raids." The testimony of other witnesses indicates that the course the raiders took conformed to the suggestions in these exhibits.

18. Chandler testified that he examined some of the documents seized at this location and found them to be "the type of thing we would be interested in."

19. The majority's pallid and somewhat misleading description of this occurrence should be compared with Chandler's own testimony, on which it is based.

Chandler testified that Colonel Lukban told him that an NBI agent "had run into a big area of records and he didn't know what—he was not qualified to determine what he should take and what he shouldn't take, and he asked me if I would help him—if myself and the men would go down there and look at the records and see what should be taken and what should be left behind."

Chandler and the two IRS agents "wanted to cooperate with" Lukban and therefore went with an NBI agent to the premises where the records had been found. Upon arriving, the three agents did not merely point out the apparently significant books and records at the warehouse and leave, as the majority suggests. Chandler testified that for about half an hour he and his two agents "went through the records and segregated what we thought might be important, and * * * put them in a box." After placing the records in a box, the American agents "indicated to the [NBI] agent that that is all we could see was of any significance."

Having done this, the agents did not simply leave, as the majority's statement implies. The majority omits to mention that Chandler, acting on information Spielman had supplied, then examined bobbins of cigarette paper in the warehouse which he thought might be significant in the investigation. Chandler, who was accompanied by the NBI agent in charge, testified:

"I mentioned to him that that was the —seemed to be the paper that was overshipped, there were supposed to be more on each reel than it was marked for. The agent didn't seem to be familiar with the thing at all. I told him that he probably better check with Colonel Lukban."

20. Again, in the majority opinion, some of the flavor of the incident has been lost in the telling.

Chandler testified that after leaving the first search location, he and his two agents went to the main office of the United States Tobacco Corp. to see whether NBI activity there was "equally disorganized." Chandler entered this building, and the NBI agent in charge there was brought to him. Chandler testified:

"I asked him how things were going and just general questions and after a while I asked them if they had found— there was a records storage room in this building that Spielman had spoken of, and I asked him if he had found that —there was something peculiar about the location of the room, I don't recall now what it was; anyhow the agent didn't seem to be familiar with it, and

The majority's conclusion that these acts do not constitute "participation" in the search by American agents within the meaning of the "silver platter" doctrine does not rest entirely upon its adoption of the erroneous "joint operation" standard of participation. A second misconception of law contributes significantly to the result. The majority asserts that "[a]ll activities of United States agents in connection with the raids took place before the raids commenced or after their termination"—and this the majority identifies as one of the "principal factors" leading to its conclusion of lack of "participation." Since it is established by the majority's own version of the facts that the American agents were involved in events preceding and following the *initial physical intrusion upon the raided premises*, it is evident that the majority uses the word "raids" in this highly restricted sense.

The Supreme Court expressly rejected this approach to the application of the silver platter doctrine in *Lustig*. As Justice Frankfurter said "search is a functional, not merely a physical process. Search is not completed until effective appropriation as part of an uninterrupted transaction, is made of illicitly obtained objects for subsequent proof of an offense." He concluded that, "It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was in it before the object of the search was *completely accomplished*, he must be deemed to have participated in it." 338 U.S. at 78, 79, 69 S.Ct. at 1374.

Thus, in determining whether the American agents participated in the searches and seizures, the enterprise must be viewed as a functional whole. The contributions which the American agents made, before the raids, in selecting places to be searched and things to be seized, cannot be treated as unrelated to the total enterprise. Neither can the conduct of our agents, after the raids had begun, in examining records, selecting and segregating significant material for seizure, and consulting with and advising NBI agents in the conduct of the searches; these acts were clearly an integral part of the "effective appropriation" of the illicitly seized evidence.[21]

In light of this conduct of the American agents, it is of no consequence that they may have "objected to the raids." Officials of our government are obliged to adhere to the Constitution; it is not enough that they violate its limitations reluctantly.

This is the point of central importance. Because our government "is entirely a creature of the Constitution,"[22] it is bound to respect the limitations which the Constitution imposes upon its powers, whether it acts at home or abroad.[23] Because the United States, acting through its agents,[24] participated in searches and seizures which were in flagrant violation of the Fourth Amend-

I tried to tell him about it as best I could remember from what Spielman had said, but he didn't seem to understand. He finally said, 'Come up and show me.'"
Chandler testified that he then showed the NBI agent where the record storage room was located.
The *majority omits to mention that* NBI agents subsequently entered the room identified by Chandler and removed the records, and that a witness testified that Chandler accompanied the NBI agents into the room, although Chandler denied it.

21. Moreover, the uncontradicted testimony established that it was not until several hours after these events that the NBI loaded the fruits of the raids into trucks and left the two premises involved.

22. Reid v. Covert, 354 U.S. 1, 5–6, 77 S. Ct. 1222, 1225, 1 L.Ed.2d 1148 (1957).

23. Id.; see Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); Mitchell v. Harmony, 54 U.S. (13 How.) 115, 14 L.Ed. 75 (1852); Saylor v. United States, 374 F.2d 894, 898–901, 179 Ct.Cl. 151 (1967); Powell v. Zuckert, 125 U.S.App.D.C. 55, 366 F.2d 634, 639–640 (1966). See also Best v. United States, 184 F.2d 131, 138 (1st Cir. 1950).

24. It is clear that the American agents acted throughout in their official capacities; there is no claim to the contrary.

ment, the evidence acquired should be suppressed.[25]

Even if this were not so, reversal would be required on a second, independent ground—the inadequacy of the trial court's findings. The majority has undertaken to fill the gaps by de novo fact-finding of its own; this an appellate court may not do. The only proper course is to remand the case to the trial court for further consideration and the entry of adequate findings.[26]

One example has been mentioned earlier—the district court made no finding as to whether or not one purpose of the raids was to obtain evidence for use in an American tax prosecution. Indeed, the trial court's findings appear deliberately to avoid the issue.[27] The majority opinion, on the other hand, flatly asserts that "the purpose of the raids was to uncover violations of Philippine law, *not* to obtain evidence for the United States agents"; and again, that "[t]he *sole purpose* of the raids was to obtain evidence for Philippine proceedings" (emphasis added).

The majority makes this finding in the face of substantial evidence to the contrary. Indeed, a Philippine official who participated in the raids testified directly that the Philippine authorities "were actually cooperating with [the Americans] for their tax case. Our interest was mainly on the involvement of politicians in possible wrongdoings in that country." He testified that he was told by Chandler just before the raids "that we needed to get all the vouchers, accounting forms, books of account, that may help them in this tax case." He further testified that his Philippine superior indicated, in advance of the raids, that "whatever we could get by forms or accounting forms and vouchers that might help the United States should be shown to them." There was, in addition, an abundance of circumstantial evidence

---

25. The caveats in note 2 of the majority opinion are without substance. The issue of standing was expressly reserved by the district court and is not before us. With all due respect, appellee's "impeachment" argument, which calls for an indiscriminate extension of the limited rule of Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), is frivolous. There is little more substance to the suggestion that the exclusionary rule is inapplicable because this is a civil case. Rogers v. United States, 97 F.2d 691 (1st Cir. 1938), relying upon Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426 (1920), is directly in point. Illegally seized evidence may not be used in a quasi-criminal context, such as a forfeiture proceeding. E.g., One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965); Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1885). Although the Supreme Court distinguished tax proceedings such as this from quasi-criminal proceedings for some purposes in Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938), more recent decisions illuminating the purpose and scope of the exclusionary rule indicate that the Court would extend the rule to "civil" suits of the kind instituted by the United States here. See,

e. g., Camara v. Municipal Court, 387 U.S. 523, 530–531, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182 (1920).

26. Cf. Kelley v. Everglades Drainage Dist., 319 U.S. 415, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943); Irish v. United States, 225 F.2d 3, 8 (9th Cir. 1955); 2B W. Barron & A. Holtzoff, Federal Practice and Procedure § 1138 (Wright ed. 1961).

27. The most nearly relevant findings of the district court read:
   "For some time before Colonel Lukban's interview with Mr. Speilman, the Philippine National Bureau of Investigation had been engaged in gathering evidence concerning the activities of Stonehill and Brooks, which evidence was for use in deportation proceedings against them * * *.
   During the deportation investigation, Colonel Lukban determined that a raid should be made upon premises occupied by Stonehill and Brooks * * *." 274 F.Supp. at 421.
   These findings contain no direct statement as to the purpose of the raids. They clearly do not exclude the possibility that one object of the raids was to obtain evidence for United States use.

that one of the purposes of the raids was to obtain evidence for an American tax prosecution.[28]

It is, of course, the exclusive function of the trial court to resolve the conflict between this evidence and that upon which the majority presumably bases its finding. Since the issue may well be determinative,[29] remand is required.

There are many other instances of de novo fact-finding scattered through the majority's account of the activities of the American agents. A few examples will suffice.

The majority finds that "Chandler did not assist in planning the raids"; the trial court found only that the raids were not "instigated" by Chandler or other United States officials. The majority's finding ignores the evidence of Chandler's participation in the numerous planning meetings which preceded the raids,[30] his selection of one of the locations to be raided,[31] and his preparation of the diagram and memorandum identifying places to be searched and types of documents to be seized.[32]

The majority finds that this diagram and memorandum "inadvertently fell into

28. The following is a summary of a portion of this evidence. American interest in a possible tax case against Stonehill antedated Spielman's appearance by many years. Both before and after receiving Spielman's information the local American tax agents were aware of the need for an investigation of Stonehill's tax affairs but lacked the personnel to conduct it. Assistance was requested of Washington, but was not forthcoming. Chandler and FBI Agent Hawley took Spielman to the Philippine authorities. Chandler told the Philippine authorities that he thought there was an American tax case against Stonehill, but that the evidence had to be secured. Colonel Lukban told Chandler that if Spielman's story checked out he would seek approval of an investigation by Philippine authorities. Chandler testified that in the course of meetings with Philippine authorities prior to the raids he made it clear that his interest was in appellant's tax records as distinguished from those relating to bribery or political matters. When first told that the raids were contemplated, Chandler asked that they be postponed until he could obtain help from Washington. Later the raids were postponed for a week. A Philippine official testified that the reason for this postponement was that the people who were to come from the United States to help Chandler had not arrived. One of the American tax agents expected by Chandler arrived in this interval. Chandler and an FBI agent assisted in arranging a meeting in Hong Kong between the Philippine Secretary of Justice and the Executive Assistant to the Attorney General of the United States. The contemplated raids were discussed at this meeting. Upon his return to Manila, the Secretary of Justice ordered the raids to proceed. The warrants issued by the Philippine magistrates referred to possi-

ble violation of internal revenue laws, but the Philippine Bureau of Revenue had no contact with the case before the raids. In the course of the raids Chandler and his associates were requested to, and did, select and segregate significant accounting records from the mass of documents found at one of the raided premises. At Chandler's request, Colonel Lukban agreed in advance to make the seized documents available to the American agents, and in fact did so. The agents examined and copied documents over a period of about three months, initially in office space provided by the Philippine authorities.

29. Gambino v. United States, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293, 52 A.L.R. 1381 (1927) involved a search conducted solely to aid enforcement of a federal statute, but later decisions extended *Gambino's* exclusionary rule to evidence seized by state officers in contemplation of possible federal use even though the state officers also contemplated use of the seized evidence in a state prosecution. Lowrey v. United States, 128 F.2d 477, 478–479 (8th Cir. 1942); Sutherland v. United States, 92 F.2d 305, 307–308 (4th Cir. 1937); Fowler v. United States, 62 F.2d 656,' 657 (7th Cir. 1932). But see Kitt v. United States, 132 F.2d 920, 922 (4th Cir. 1942).

Justice Frankfurter said in *Elkins* that the "question has always been whether the offending search or seizure was conducted *in any part* * * * in the interest of the Federal Government; or whether it was conducted * * * *exclusively* for state purposes." 364 U.S. at 236, 80 S.Ct. at 1455 (dissenting opinion) (emphasis added).

30. See note 16.

31. See text at note 18.

32. See note 17.

the hands of the NBI," and "were not intended as directions to the NBI"; the district court found only that these documents "thereafter came into the possession of" the NBI. The evidence may support the trial court's carefully limited finding; it does not support the finding of the majority.[33]

The district court made no findings at all with respect to the two visits by the American agents to raided premises in the course of the search. The majority's version of these incidents is based entirely upon the testimony of Chandler and one of his assistants. It does not fully reflect even that testimony which, with other evidence, is inconsistent with the majority's finding denigrating the significance of these events.[34] This intervention by the majority in the fact-finding process may be of particular significance since the trial court apparently shared the majority's misapprehension that these events were irrelevant, and, freed of that error, might well have found from the evidence that this conduct by the American agents exceeded permissible limits.

At the very least, therefore, reconsideration by the trial court is plainly required.