UNITED STATES of America, Plaintiff,

v.

Harry S. STONEHILL et al., Defendants.

Civ. No. 65–127–GJS.

United States District Court,
C. D. California.

July 23, 1976.

**50**

Wm. D. Keller, U.S. Atty., Charles H. Magnuson, Asst. U.S. Atty., Los Angeles, Cal., Stanley F. Krysa, Arthur L. Biggins, Dept. of Justice, Washington, D.C., for plaintiff.

Trammell, Rand, Nathan & Lincoln, Washington, D.C., Ball, Hunt, Hart, Brown & Baerwitz, Long Beach, Cal., for defendants Harry S. Stonehill and Robert P. Brooks.

Ted T. Ward, Winkler & Ward, Los Angeles, Cal., for defendant Lourdes B. Stonehill.

### OPINION

SOLOMON, District Judge.

#### I. *Preliminary Statement*

This is an action to foreclose federal tax liens of about $25 million.

Defendants Harry S. Stonehill and Robert P. Brooks (the taxpayers) are United States citizens who settled in the Philippines after World War II. They became successful and powerful businessmen. They owned, were officers of, or controlled many business organizations and were active in Philippine politics.

About 1960, both Philippine and United States officials became interested in the taxpayers' activities. On March 3, 1962, about 200 agents of the Philippine National Bureau of Investigation (the NBI) raided the offices of the taxpayers and the offices of 17 companies which they controlled. The NBI took about 35 truckloads of documents.

Agents of the United States Internal Revenue Service (the IRS) spent months examining these documents. On January 18, 1965, the Commissioner of the IRS assessed income tax deficiencies for the tax years 1958 through 1961 against defendant Stonehill of $13,613,721.51 and against defendant Brooks of $11,182,966.73.

On January 25, 1965, the United States filed this action to foreclose tax liens on certain property owned by the taxpayers in this district. Similar foreclosure actions were filed in the Northern District of California[1] and in the District of Hawaii[2]. In an order dated April 9, 1965, the United States and the taxpayers stipulated that, when all opportunities for appeal have been exhausted, the judgment of this Court shall be entered as the judgment in the other two cases.

Thirteen years after the Philippine raids, this case was finally tried on the merits. The parties engaged in extensive discovery; they followed leads and gathered evidence in the Philippines, the United States, Canada, Belgium, Luxembourg, Switzerland, Japan, and Hong Kong. The parties vigorously litigated the taxpayers' charges that the Government illegally seized certain evidence. The taxpayers' motion to suppress was denied by the trial court, and in 1968 the Ninth Circuit Court of Appeals affirmed; the Supreme Court denied certiora-

---

1. Civil Action No. 43244.

2. Civil Action No. 2348.

ri. The taxpayers renewed the motion to suppress several times.

Lawyers, accountants, and investigators for both the Government and the taxpayers have spent years working on this case, and the parties have spent many hundreds of thousands of dollars prosecuting and defending it. There have been more than 35 separate court sessions. In 1972, I became the third judge assigned to the case.

The decision of this case has been complicated by the complexity of the taxpayers' financial transactions and business entities, by the non-existence or unavailability of crucial records and documents, by the unavailability or noncooperation of important witnesses, including Stonehill and Brooks who refused to appear, and by sensitive political and diplomatic considerations.

These difficulties have been compounded by numerous allegations of misconduct asserted by the Government against the taxpayers and by the taxpayers against the Government at all levels. The Government alleges that the taxpayers made fortunes through illegal business activities, fraudulently concealed millions of dollars in income, bribed high Philippine officials, and sometimes resorted to gangland tactics to deal with their enemies.

The taxpayers allege that the Government, through the Justice Department, the State Department, the IRS, the Federal Bureau of Investigation (the FBI) and the Central Intelligence Agency (the CIA), conspired with Philippine officials to ruin them financially and to force them to leave the Philippines. The taxpayers further allege that the Government illegally seized and stole their records, spread false and malicious rumors about them, caused them to be arrested and deported from the Philippines and excluded from other foreign countries, planted a Government informer in their business, illegally tapped their telephones, and deliberately concealed evidence favorable to them.

## II. *Motion to Suppress*

In March 1967, the taxpayers filed a motion to suppress. In October 1967, after a nine-day hearing on this motion, District Judge Westover denied it. 274 F.Supp. 420 (S.D.Cal.). His interlocutory order of denial was appealed under 28 U.S.C. § 1292(b). The Ninth Circuit Court of Appeals affirmed. 405 F.2d 738 (1968), *rehearing denied*, 405 F.2d 738 (1969), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747, *rehearing denied*, 396 U.S. 870, 90 S.Ct. 39, 24 L.Ed.2d 125.

The Court of Appeals held that, although the 1962 raids were illegal under both United States and Philippine law, the evidence seized in those raids was admissible because it was handed to United States officials on a "silver platter". After setting forth the role that United States officials played in the raids, the Court concluded that the United States officials did not instigate or direct or significantly participate in the raids by Philippine officials. The case was remanded to the district court for trial on the merits.

In February 1971, the taxpayers filed a "Renewed Motion to Suppress Evidence" based on newly discovered evidence. On May 26, 1971, Judge Westover denied the renewed motion.

In August 1971, the taxpayers filed a "Motion for Reconsideration of Order Dated May 26, 1971". In November 1971, Judge Westover, after oral argument, denied the motion because the new evidence was "merely cumulative of evidence previously offered" and raised "no new significant evidence in support of . . . [the taxpayers'] position".

In May 1975, the taxpayers renewed their motion to suppress, which is now before the Court. They contend that new evidence discovered since the 1968 Court of Appeals' decision requires suppression of the evidence seized in the 1962 raids. In addition, the taxpayers seek to suppress evidence which they contend was "obtained by other illegal acts and methods" such as "wiretapping and theft of documents".

The threshold question here is whether the taxpayers may renew their

motion to suppress after the Court of Appeals affirmed the denial of their earlier motion. I hold that they may.

■ The doctrine of res judicata does not apply to an interlocutory order, such as a motion to suppress, even if the order was affirmed on appeal. *Pennsylvania Turnpike Commission v. McGinnes*, 169 F.Supp. 580 (E.D.Pa.1958). The appellate decision does, however, become the "law of the case". As the Eighth Circuit said in *Toucey v. New York Life Insurance Co.*, 112 F.2d 927, 928 (1940):

"A decision of an appellate court is, as to the legal issues considered and determined, the law of the case in any subsequent proceedings in either the trial or the appellate court, and is to be followed except where the evidence is substantially different, or where, between the date of the decision and the time of the reconsideration of the case, controlling authority has determined the legal issues adversely, or where it appears that the decision was clearly erroneous and that adherence to it will work a manifest injustice."

The Court of Appeals' opinion on the taxpayers' original motion to suppress adequately sets forth the evidence before that court. I shall not repeat that evidence here.

### A. Renewal of Motion to Suppress Raid Documents

The taxpayers contend that since that decision they have discovered new evidence which proves that United States officials instigated and directed the 1962 raids.[3] They therefore contend that the evidence seized in those raids should be suppressed.

■ Because the 1968 Court of Appeals' decision is the law of this case, the taxpayers can prevail only if they show that the newly discovered evidence, when considered with the total record, materially changes the evidence in support of their position.

The taxpayers contend that their new evidence shows that United States officials were actively investigating the taxpayers much earlier than the previous evidence showed. They also contend that the Philippine authorities who conducted the raids were acting at the instigation and direction of United States officials.

Contrary to these contentions, I find that United States officials were interested in the taxpayers' activities before Menhart Spielman talked to FBI agent Hawley in December 1961, but that these officials did not conduct an active investigation. But even an active investigation before December 1961 does not prove that the United States officials had anything to do with the raids.

Furthermore, even if they did actively investigate the taxpayers before December 1961, that does not materially add to the evidence before Judge Westover in 1967. By January 1962, more than a month before the raids, the officials decided to actively investigate the taxpayers. The court nevertheless concluded that the NBI conducted the raids for its own purposes and not for the United States.

The only direct evidence to support the taxpayers' contention that United States officials instigated, conducted or participated in the raids is the trial testimony of Damaso Nocon, a former aide to Colonel Jose Lukban, Director of the NBI. Nocon's testimony is directly contrary to the testimony of Lukban, IRS agent Robert Chandler and FBI agent Hawley. Each of them testified that the NBI did not conduct the raids for the United States or with the help of the United States.

I find that Nocon's testimony is not credible. I believe that the NBI conducted the raids for its own reasons. In 1959–60, several years before the raids, the NBI began to investigate the taxpayers and several other prominent foreign businessmen at the request of a Philippine senator. Antonio

---

**3.** The taxpayers' newly discovered evidence does not relate to the physical participation by United States officials in the raids.

Jocom, an NBI agent, was assigned the Stonehill investigation. The object of the investigation was to deport the taxpayers because they allegedly had a corrupting influence on Philippine politics.

As part of the investigation, the NBI wiretapped the taxpayers' telephones in early 1960. During the next two years, the NBI gathered substantial information, and, when Spielman began to cooperate with the NBI in January 1962, the NBI planned the raids which took place on March 3, 1962.

■ United States officials were interested in the fruits of those raids, but I find that they neither instigated nor directed them. The motion to suppress this evidence is denied.

### B. Suppression of Evidence from Wiretaps and "Thefts" of Documents

The taxpayers contend that all of the Government's evidence should be suppressed because it came, directly or indirectly, from illegal wiretaps and thefts of documents. This argument, not previously urged, is based on newly discovered evidence.

The taxpayers contend that the NBI wiretapped their telephones at the request of the United States, that those wiretaps were illegal, and that all of the evidence subsequently gathered by the United States is the fruit of that illegal activity.

NBI Director Lukban testified that the NBI installed the wiretaps in the course of its own investigation of the taxpayers, without any input from the United States. FBI agent Robert Hawley, who was given some transcripts by the NBI, testified that he never asked for wiretaps or transcripts.

The only evidence which supports the taxpayers' position is the testimony of Damaso Nocon, Lukban's aide. As I said earlier, I do not believe Nocon's testimony.

The taxpayers next contend that the United States, through Menhart Spielman, unlawfully took documents from them, and that all of the evidence subsequently gathered by the United States is the fruit of that illegal activity.

Spielman worked for the taxpayers for about two years. In March 1961, he became Executive Vice President and General Manager of United States Tobacco Corporation, one of the taxpayers' principal companies. During the fall of 1961, both taxpayers were out of the country because of controversy over their role in the on-going Philippine election campaign.

In the taxpayers' absence, Spielman secretly copied some of their records which he thought showed illegal activities. When the taxpayers returned after the election, they and Spielman quarreled; they fired Spielman. It was then that Spielman went to United States officials, told them about the taxpayers' activities, and gave them copies of many documents.

The taxpayers contend that the United States had placed Spielman in the taxpayers' business as an informer and that the documents were therefore illegally obtained.

The taxpayers' evidence, both old and new, fails to prove that Spielman was an agent of the United States when he copied the documents. I find that Spielman copied these records to force the taxpayers to give him part ownership in their business enterprises. When Spielman proposed this, they first beat him and then fired him.

Spielman became fearful of what else they might do to him, so he went to United States officials for protection and for vengeance. He also hoped to receive a reward from the United States for providing information leading to substantial income tax revenue. When United States officials became interested in his revelations, Spielman tried to bargain to get the United States Army to forgive him for his misdeeds while stationed in Tokyo.

■ The taxpayers failed to show that their telephones were tapped at the request of the United States or that Spielman was an agent of the United States when he

copied the documents. Their motion to suppress is denied.[4]

### III. *Taxpayers' Due Process Motion*

The taxpayers seek a "dismissal of Plaintiff's ("Government") complaint and for judgment quashing the purported assessments and liens sought to be foreclosed" on the ground that the Government denied them due process.

When NBI agents raided the taxpayers' business premises on March 3, 1962, they seized about 35 truckloads of documents. The NBI permitted IRS agents, who were investigating the taxpayers, to copy some of those documents. During discovery in this action, the Government gave the taxpayers copies of all of its copies.[5]

The taxpayers contend that the IRS agents copied only documents which tended to support the Government's case and intentionally suppressed documents favorable to the taxpayers.

The NBI seized these records, and more than 20 NBI agents cataloged them. Although the records were under the NBI's exclusive control, it permitted IRS agents to set up a microfilm machine in the house in which the records were kept. The NBI did not, however, give the IRS agents unrestricted access to the records. The IRS agents were allowed to examine and copy only those documents which they requested and which the NBI thereafter brought to them.[6]

The IRS agents testified that they repeatedly asked the NBI agents to bring them all financial records on the taxpayers and their companies. The IRS agents "specifically mentioned bank accounts, money transfers, assets, liabilities, loans, investment and ownership in corporate and other entities." The IRS agents testified that they copied all relevant financial records brought to them[7] without regard to whom they favored.[8] I believe that testimony.

■ I find that the taxpayers failed to prove that the Government intentionally suppressed any relevant documents. Their motion is denied.

### IV. *Tax Liability*

The Government contends that the taxpayers increased their combined net worth by almost $16 million during the tax years 1958 through 1961. During that period, taxpayers reported combined incomes of less than $200,000. Using these net worth figures, the Government, in January 1965, assessed the taxpayers more than $14,000,-000 in unpaid taxes, more than $7,000,000 in fraud penalties, and more than $3,000,000 in interest.

The taxpayers contend that the assessment is wrong and that they owe no taxes.

■ In an action to collect taxes, the Government has the burden to prove the existence and amount of tax deficiency. *United States v. Molitor*, 337 F.2d 917, 922 (9th Cir. 1964). To meet this burden initial-

---

**4.** *See also Stone v. Powell*, —— U.S. ——, 96 S.Ct. 3037, 49 L.Ed.2d ——, decided July 6, 1976.

**5.** These documents given to the taxpayers by the Government are the only access that the taxpayers have had to most of their records since they were seized. The NBI kept most of the records and has not allowed the taxpayers to see them.

**6.** The IRS agents worked 12 hours a day, seven days a week, for about two and a half months, copying more than 30,000 documents.

**7.** The IRS agents undoubtedly did not receive every relevant document seized in the raids; millions of documents had to be processed hurriedly by a large number of people because the

taxpayers were expected to enjoin the examination of the records. The taxpayers did obtain an injunction a few weeks after the IRS finished most of its copying.

**8.** Agent Ragland testified: "During the copying process we did not have any idea of what was significant to the audit, and therefore, we were expansive in copying the documents. At this juncture we did not have sufficient knowledge to exclude any financial documents. For instance, a personal financial document indicating a liability could lead to a significant asset and additional income. Also any large asset or liability appearing in any previous year could lead us to sources of more income includible in the tax years under examination."

ly, the Government may introduce the notice of assessment. The assessment is presumed to be correct, and the admission of the notice of assessment establishes a prima facie case. *United States v. Rindskopf*, 105 U.S. 418, 422, 26 L.Ed. 1131 (1881); *United States v. Molitor, supra* at 922–23.

### A. *The Government's Prima Facie Case*

The taxpayers contend that the Government failed to make a prima facie case.

They contend that the assessments, which underlie the Government's prima facie case, are improperly based on the net worth method. They contend that the Government may use net worth only if the taxpayers' records are either inadequate or do not accurately reflect the taxpayers' income. This, they assert, the Government failed to show.

■ This contention is frivolous. The taxpayers' records available to the Government are incomplete and do not accurately reflect the taxpayers' income.[9]

The taxpayers next contend that the Government did not make a prima facie case because it did not introduce in evidence the notices of deficiency.

Generally, the Government begins its tax collection process by sending the taxpayer a notice of deficiency which shows the basis and the amount of tax due. 26 U.S.C. § 6212(a). But, when the "assessment or collection of a deficiency . . . will be jeopardized by delay", the Government may make a jeopardy assessment by sending notice of assessment (also called a collection notice) under 26 U.S.C. § 6303 before sending the notice of deficiency. 26 U.S.C. § 6861(a). When the Government makes a jeopardy assessment, it must also send a Section 6212(a) notice of deficiency "within 60 days after the making of the assessment". 26 U.S.C. § 6861(b).

Here, the Government initiated its collection process by issuing jeopardy assessments. At the trial, the Government introduced the notices of assessment to establish its prima facie case but did not introduce notices of deficiency.

■ The taxpayers contend that the Government is not entitled to the presumption of correctness and did not make a prima facie case because it did not prove that it sent the notices of deficiency as required by Section 6861(b). The taxpayers rely on *United States v. Ball*, 326 F.2d 898 (4th Cir. 1964). There, the court held that a jeopardy assessment under Section 6861(a) is not valid without both a Section 6303 notice of assessment and a Section 6212 notice of deficiency. The court held that the jeopardy assessment was invalid because the Government failed to prove it sent the notice of deficiency.

■ I do not believe that failure to introduce the notice of deficiency is fatal to a jeopardy assessment. In *Boren v. Riddell*, 241 F.2d 670, 672 (9th Cir. 1957), the court held that technical compliance with the Section 6212(a) notice requirement is not necessary if the taxpayer receives actual notice. Here, there was actual notice. The taxpayers acknowledged, at hearings and in their briefs, that they received the deficiency notices. In 1965, the taxpayers, in their petitions to the Tax Court, acknowledged receipt of the notices of deficiency. Furthermore, the Ninth Circuit Court of Appeals has stated that in a jeopardy assessment case the only purpose of the notice of deficiency is to start the time running within which the taxpayers can petition the Tax Court; even an improper notice of deficiency does not render the underlying jeopardy assessment invalid. *Cohen v. United States*, 297 F.2d 760, 773 (1962).

I therefore hold that the Government has made a prima facie case.

### B. *The Taxpayers' Burden*

The Government contends that the taxpayers have the burden to prove that the Commissioner's determination of tax deficiency is erroneous and that the burden is on the taxpayers to prove that they owe no taxes.

---

9. See the discussion in this opinion on the fraud issue.

The taxpayers, on the other hand, contend that their only burden is to prove that the Commissioner's determination is significantly incorrect. The taxpayers also contend that when they do that, the Government may no longer rely on the presumption of correctness, but must prove the existence and amount of tax deficiency.

There appears to be a conflict in the cases on burdens of proof, but the conflict is more apparent than real and results from imprecise language in the opinions. I believe that the cases are generally reconcilable and that the correct rule and the proper procedures are set forth in Mertens, Law of Federal Income Taxation:

> In an action by the Government for the collection of a tax, the burden of proof is upon the United States under the familiar rule that he who alleges, must prove. This burden is initially met, however, merely by proof that the tax liability has been assessed against the defendant; and this is usually done by introducing into evidence a certified copy of the assessment list. A prima facie case is thus established, and the defendant must go forward with his defense. In order to rebut the prima facie case established by the assessments made against the taxpayer, it is necessary to show, by a preponderance of the evidence, that the assessments were incorrect . . . . If the assessment has not been the subject of an adjudication, and the Government sues to reduce it to judgment, the taxpayer may contest the correctness of the assessment in that action, and will in effect have to assume the burden of proof on that issue. In such a case, however, if the taxpayer is successful in proving by a fair preponderance of the evidence that the assessment is erroneous, the burden shifts to the Government to prove whether any deficiency exists and, if so, in what amount. 9 Mertens, Law of Federal Income Taxation § 49.218 (April 1976) (footnotes omitted).

*Rockwell v. Commissioner,* 512 F.2d 882 (9th Cir. 1975), upon which the Government strongly relies, does not require a different result. That case involved disputed income tax deductions, and the court expressly distinguished deduction cases from those, like this one, involving unreported income. *Supra* at 886.

■ I therefore hold that the taxpayers have the burden of going forward with the evidence and the burden of proving that the Government's assessments, which underlie the prima facie case, are incorrect. If the taxpayers succeed, the burden then shifts to the Government to prove the receipt of unreported income and also the amount of that income. If the Government fails to meet that burden, it cannot prevail.

The taxpayers contend that they proved numerous errors in the Government's assessments. They therefore assert that the presumption of correctness is not available to the Government. The Government denies these contentions, and it argues that even if the taxpayers show that some parts of the assessments are erroneous, the presumption survives for other parts.

■ In my view, when an assessment has separable parts, the taxpayer has the burden to discredit each part, and the presumption survives for each part that the taxpayer fails to discredit. If, however, the errors show a pattern of carelessness or arbitrariness by the Commissioner, the presumption disappears for the entire assessment. *Clark v. Commissioner,* 266 F.2d 698, 707 (9th Cir. 1959); *Hoffman v. Commissioner,* 298 F.2d 784, 788 (3d Cir. 1962); *Foster v. Commissioner,* 391 F.2d 727, 735 (4th Cir. 1968); *Anderson v. Commissioner,* 250 F.2d 242, 246 (5th Cir. 1957).

■ This approach is particularly applicable in net worth cases when the Government must determine the taxpayer's unreported income by indirect evidence. As Judge Blackmun (now Mr. Justice Blackmun) said in *Banks v. Commissioner,* 322 F.2d 530, 548 (8th Cir. 1963), "Some error in any net worth construction is perhaps to be expected. It is only a 'reasonable certainty' which is required by [*Holland v. United States,* 348 U.S. 121, 132, 75 S.Ct. 127, 99 L.Ed. 150 (1954)] and its companion cases." A taxpayer should not be able to discredit

all of the Commissioner's determination by showing a few errors when the Commissioner was compelled to use the imprecise net worth method because of the taxpayer's own inadequate, unreliable or fraudulent record-keeping. "[S]kilful concealment [cannot become] an invincible barrier to proof." *United States v. Johnson*, 319 U.S. 503, 518, 63 S.Ct. 1233, 1240, 87 L.Ed. 1546 (1943); *Banks, supra* at 547.

▮ I therefore hold that each part of the Commissioner's determination is entitled to the presumption of correctness unless the taxpayers prove either that that part of the assessment was wrong or arbitrary or that the entire assessment was arbitrary.

### C. *The Evidence on Tax Liability*

The taxpayers contend that the Commissioner's determination of tax deficiency is not entitled to the presumption of correctness because it is arbitrary and incorrect.[10]

### 1. *The Community Property Issue*

During the tax years, both taxpayers were married to Philippine citizens. The taxpayers contend that, under Philippine community property law,[11] one-half of most of their income during the tax years belonged to their wives, whose incomes are not subject to United States income taxes. The taxpayers therefore argue that the Commissioner's determination of taxable income is not entitled to the presumption of correctness because it includes their wives' share of the community income.

▮ The Government conceded before trial that the taxpayers "should be taxed on only one-half the income of the conjugal partnership". The Government contends,

however, that this error in the Commissioner's determination does not destroy the presumption of correctness for the entire assessment. I agree.

The Commissioner's decision not to apply Philippine community property law to reduce the taxpayers' taxable income involved difficult issues both on the law of conflicts and on the law of Philippine community property. Even the taxpayers' expert on Philippine law testified that the community property issue was "sticky", and the taxpayers acknowledge that experts "differ quite a bit" on the issue. Furthermore, the taxpayers did not make community property claims for their wives in their income tax returns before 1962.

I therefore find that the Commissioner's determination on community property, although incorrect, was reasonable. This error does not prove carelessness or arbitrariness in making the assessment. I therefore hold that the Commissioner's determination, as modified by community property considerations, continues to be entitled to the presumption of correctness.

### 2. *Opening Net Worth*

The Commissioner used the net worth method to compute the taxpayers' income. The taxpayers contend that the Commissioner's determination of income is overstated because the opening net worth figures of $687,640.90 for Stonehill and $219,782.97 for Brooks are grossly understated.

The taxpayers first contend that the Commissioner "ignored uncontradicted evidence of substantial cash on hand" at the beginning of the tax years when he determined that Stonehill had only $3,904.50 in cash and Brooks had only $31,049.37 in cash.

---

**10.** Because the Government relied on the presumption of correctness, it did not introduce evidence to prove each item of unreported income. In its post-trial brief, however, the Government sought to use evidence submitted for a limited purpose to support the correctness of the Commissioner's determination.

The taxpayers moved to strike parts of the Government's brief asserting that the Government incorrectly relied on evidence which had been admitted solely on the issue of fraud.

I will not discuss each objection. I merely repeat what I said at the trial. The Government may rely on any evidence to defend the integrity of the Commissioner's determination against the taxpayers' attacks. The Government may not, however, rely on evidence admitted on the issue of fraud to prove specific items of tax liability.

**11.** The terms "community property" and "conjugal partnership" are used interchangeably because here they have the same meaning.

58

The taxpayers argue that, considering their methods of operation and the size of their business enterprises, those opening cash figures are unrealistic and unreasonable.

The taxpayers rely on *Gunn v. Commissioner*, 247 F.2d 359, 362–365 (8th Cir. 1957). There the Commissioner determined that the taxpayer had no cash at the beginning of the tax period. The taxpayer introduced extensive evidence, including testimony by his bookkeeper, his banker, and his accountant, to show that he always had considerable cash on hand for use in his business of buying produce from farmers and selling it to canneries. The bookkeeper testified that the taxpayer regularly kept $2,500 to $5,000 on hand. The court held that, in light of the taxpayer's business history and practice, the Commissioner's determination was unrealistic. The court reversed and remanded for additional hearings.

The taxpayers also rely on *Potson v. Commissioner*, 22 T.C. 912, aff'd sub nom. *Bodoglau v. Commissioner*, 230 F.2d 336 (7th Cir. 1956), and *Thomas v. Commissioner*, 232 F.2d 520 (1st Cir. 1956). In each of these cases, the court held that the Commissioner's determination of opening net worth was wrong because there was substantial evidence showing that the taxpayer had much more cash on hand than the Commissioner's figures showed. In each case, the taxpayer estimated how much cash he had.

Here the Commissioner was faced with many obstacles in his attempt to find all of the taxpayers' opening assets. The taxpayers' business enterprises were complex and widely scattered. Much of the Commissioner's investigation of the taxpayers took place in foreign countries. The taxpayers' records did not accurately reflect their financial operations, and the Commissioner did not have complete access to those records.

█ Under these circumstances, the Commissioner should not be faulted for his failure to speculate on the amount of additional cash and other assets which the taxpayers may have secreted. In my view, the Commissioner made a reasonable and conscientious effort to find all of the taxpay-

ers' opening assets, and he followed all reasonable leads to obtain such information. When, as here, records are inaccurate and assets concealed, the burden should be and I believe is on the taxpayers to prove the existence and the approximate amount of that cash.

The taxpayers did not meet that burden. Unlike the cases upon which they rely, the taxpayers did not provide any credible evidence on the amount of cash they had at the beginning of the tax period. That evidentiary deficiency was not overcome by a statement from a former employee that in the early 1950's the taxpayers used a great deal of cash in their businesses and that between 1957 and 1962 they illegally sent large amounts of cash to accounts outside of the Philippines. Neither is that deficiency overcome by evidence that in 1957 and 1958 they paid 10 million pesos in cash to high Philippine officials for an exclusive trade permit for the importation of American tobacco. This general evidence shows that at different times the taxpayers did have large sums of cash on hand, but it does not show that on December 31, 1957, the date of the opening net worth, the taxpayers had more cash on hand than was credited to them by the Commissioner. It is just as reasonable to believe that on that date the taxpayers, who had just paid 10 million pesos in cash, were short of cash.

█ The taxpayers, who might have shed light on their cash position, refused to testify either in person or by deposition. When a party who has special information relevant to his case refuses to testify, the Court may infer that his testimony would be unfavorable to his case. *Stoumen v. Commissioner*, 208 F.2d 903, 907 (3d Cir. 1953); McCormick, Evidence § 272 (2d ed. 1972).

█ I therefore hold that the taxpayers have not met their burden to prove that the Commissioner's determination on the cash they had on hand on December 31, 1957, was either incorrect or arbitrary.

The taxpayers next contend that the Government improperly excluded a major asset from their opening net worth.

In late 1957, the taxpayers made payments totalling 10 million pesos[12] in cash, to high Philippine officials in return for a tobacco barter permit.[13] Until that time, United States tobacco, which was in great demand, could not be imported into the Philippines. The barter permit was the only barter permit for United States tobacco issued by the Philippine government and gave the taxpayers a monopoly on the importation of United States tobacco.

The taxpayers paid for the permit with personal funds, but the permit was formally issued to Philippine Tobacco and Flue-Curing Company (PTFC).[14] The principal beneficiary of the permit was United States Tobacco Company (USTC)[15] which bought and used most of the imported tobacco to make cigarettes. Universal New York, Inc. (UNY)[16] was designated foreign supplier of the tobacco for importation under the permit.

The taxpayers contend that the 10 million pesos paid for the barter permit should have been "reflected in accounts receivable *from* the corporations or as capital investments *in* the corporations . . . ." (emphasis in original) The Government contends that the payment was not included in the opening net worth because it was a personal expenditure.

■ I agree with the taxpayers. The taxpayers "bought" the barter permit be-

cause they expected it to generate income and profits from the importation of United States tobacco and the sale of cigarettes made from that tobacco. The payment may have been immoral and illegal, but it was a business investment, not a personal expenditure.

Nevertheless, the Commissioner's erroneous exclusion of this asset from the opening net worth does not destroy the presumption of correctness for the entire assessment.

The 10 million peso payment for the permit was an unusual transaction which raised unusual problems for the Commissioner. First, the transaction was illegal. Second, the transaction was not reflected on the books of any of the taxpayers' corporations. Third, the Commissioner's determination that the payment was a personal expenditure was reasonable, although I now conclude that it was not a personal expenditure but a business investment.

I therefore hold that the Commissioner's determination must be modified by adding 10 million pesos to the taxpayers' opening net worth as either an account receivable or a capital investment. The pesos should be converted to dollars at the same rate of exchange that the Government used when it computed the taxpayers' income for the tax years 1958 through 1961.

The taxpayers next contend that the Commissioner understated the value of an asset included in the opening net worth.

12. At the official currency conversion rate, this was about $5,000,000. At the black market rate, it was about $3,000,000.

13. Some of these payments may have been made in early 1958. Under the Government's theory, the exact date is immaterial.

14. PTFC is a publicly-owned Philippine corporation which grows, processes and stores locally grown tobacco. About one-half of all tobacco grown in the Philippines was processed or stored by PTFC. Stonehill and Peter Lim organized PTFC in 1950; each owned 50 per cent of the stock. PTFC went public about 1953. During the tax years, Stonehill was the president and managing director and owned some stock.

15. USTC is a Philippine corporation which manufactures cigarettes. Its principal brands, Old Gold and Kent, are manufactured under a

franchise from P. Lorillard Company. Stonehill organized USTC in 1950. Until December 31, 1958, Stonehill owned 65 per cent of the stock. After that date, Stonehill owned 50 per cent and Brooks owned 35 per cent of the stock. During the tax years, Stonehill was chairman of the board, and Brooks was president and general manager. USTC is now known as Quality Tobacco Corporation.

16. UNY is a New York corporation in the import-export business. It was organized in 1947 by Ira Blaustein, a business associate of Stonehill, to be Stonehill's representative in the United States. UNY represented several of Stonehill's enterprises, including PTFC and USTC. After 1950, Stonehill owned 55 per cent of the stock, Blaustein owned 25 per cent, and Brooks owned 10 per cent.

At the beginning of the tax period, both taxpayers owned stock in United States Tobacco Company (USTC). To determine the amount of the taxpayers' investment in that stock, in pesos, the Commissioner relied on reports required to be filed by USTC with the Philippine Securities and Exchange Commission (the PSEC). The Commissioner then converted the pesos to dollars at the black market rate of 3.54 pesos to the dollar.

The taxpayers contend that the Commissioner should have obtained his figures from USTC's accounting reports rather than from the PSEC reports and that the Commissioner should have used the official conversion rate of two pesos to the dollar.

■ The Commissioner's use of the PSEC figures was proper. The taxpayers cannot now complain about the inaccuracy of figures that they themselves submitted to an official Philippine government agency. Furthermore, the Commissioner's distrust of the company's accounting reports was justified. The taxpayers have frequently acknowledged that the company's records did not fully reflect its operations, and the Government's evidence proves it.

■ The Commissioner's use of the black market conversion rate was also proper. The taxpayers used that rate on their income tax returns, and they were not prejudiced because the Commissioner used the same conversion rate at both the beginning and the end of the tax period.

## 3. Increases in Net Worth

The Commissioner determined that during the tax years 1958 through 1961 Stone-

hill's net worth increased about $8,330,000 and Brooks's about $7,560,000. The taxpayers contend that the Government did not prove "a likely source" for those net worth increases as required by *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).[17]

The taxpayers assume that *Holland* is applicable here even though it was a criminal case. The Government does not discuss whether *Holland* is applicable to a civil tax case or whether the presumption of correctness makes it unnecessary to show a likely source for net worth increases from current taxable income. It is unnecessary for me to decide that issue because I believe the evidence here establishes likely sources.

■ The taxpayers received large kickbacks through UNY, and they received unreported dividends and interest from investments made even during the tax years. There was also evidence that the taxpayers siphoned large sums of money from USTC,[18] PTFC and numerous other business enterprises which they controlled and that they got kickbacks from Philippine cigarette manufacturers who bought imported tobacco through PTFC. These are "likely sources"; ". . . the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the [taxpayer]." *Holland, supra,* at 138, 75 S.Ct. at 137.

■ The taxpayers next contend that the Commissioner improperly increased their closing net worth by erroneously and arbitrarily increasing the amount of their investment in USTC.

Before and during the tax years, the Philippine government had strict currency restrictions. Pesos could be sent out of the

17. In *Holland,* the Supreme Court said:
" . . . . [R]equisite to the use of the net worth method is evidence supporting the inference that the defendant's net worth increases are attributable to currently taxable income.

. . . Increases in net worth, standing alone, cannot be assumed to be attributable to currently taxable income. But proof of a likely source, from which the jury could reasonably

find that the net worth increases sprang, is sufficient. . . . " *Supra* at 137–138, 75 S.Ct. at 136.

18. There was evidence that USTC evaded Philippine cigarette revenue taxes by illegally purchasing some revenue stamps from the printer who supplied the Philippine government with these stamps and that, through unreported sales of cigarettes with these illegal stamps, USTC generated large sums of unreported cash.

country only with the approval of the Central Bank.

During the tax years, the taxpayers regularly sent large sums of pesos out of the Philippines through black market money exchangers. Much of this money was deposited in Swiss bank accounts to the credit of the taxpayers and later used for Philippine companies owned or controlled by the taxpayers.

In 1958, the taxpayers obtained the tobacco barter permit. The permit was issued to PTFC; it allowed PTFC to import 10,000,000 pounds of United States tobacco on the condition that PTFC export 14,000,-000 pounds of Philippine tobacco.[19] The principal beneficiary of the permit was USTC; it bought most of the imported tobacco to make cigarettes. In the first 15 months after USTC began to receive United States tobacco for use in its cigarettes, its share of the Philippine cigarette market jumped more than 1500 per cent—from 3.7 per cent to 58 per cent. UNY was the export agent for the United States tobacco which was imported into the Philippines.

Under the permit's currency restrictions, PTFC could spend, through the Central Bank, only $4,900,000 for the United States tobacco, or an average of 49 cents a pound. United States tobacco cost more than 49 cents a pound; it averaged about 75 cents a pound. The taxpayers had to find ways, outside official currency channels, to get the extra funds to UNY in the United States. They sent most of the money through their Swiss bank accounts. UNY obtained additional money in the United States through profits and various special arrangements. For example, UNY required United States tobacco companies to pay it a 3 per cent commission on all tobacco exported to the Philippines; UNY also received a $12 per ton freight differential on tobacco shipped to the Philippines.

When UNY received an invoice from a United States tobacco company for tobacco shipped to the Philippines, UNY billed the Philippine purchaser, usually USTC, about 49 cents a pound, although the actual purchase price averaged about 75 cents a pound. To make up the difference, the taxpayers sent money to UNY from their Swiss bank accounts. On its books, UNY credited the money from the Swiss accounts to USTC. There were no complementary entries on USTC's books.

The taxpayers used the same unofficial channels to buy machinery and supplies, such as cigarette paper and filters, for USTC and to pay royalties to P. Lorillard Company on USTC's behalf. During the tax years, the credits to USTC's account at UNY from money going through unofficial channels totalled about $5 million.

The taxpayers also used money from their unofficial channels to buy real estate and securities in the United States. Some of that is the property upon which the Government asserts the liens that it seeks to foreclose in these proceedings.

When the Commissioner computed the value of the taxpayers' closing assets here, he treated the payments through unofficial channels for USTC's account as capital contributions by the taxpayers to USTC. The value of the taxpayers' investment in USTC and their closing net worth were thereby increased by about $5 million.

The taxpayers contend here that this increase in their net worth was improper. They first contend that the money sent from the Philippines to UNY was corporate rather than personal money. In the alternative, they contend that, if the money did belong to them, it was money they had on hand before the beginning of the tax period rather than from current taxable income.

In the assessment, the Commissioner determined that the money belonged to the taxpayers personally and that it was from current taxable income. His determinations are presumed to be correct, and the taxpayers have the burden to prove that

---

19. The theory of the barter permit was that the currency derived from the exported Philippine tobacco would be about the same as that expended on the imported United States tobacco. That was not the case. United States tobacco cost about three or four times as much as Philippine tobacco.

the determinations are wrong. The taxpayers have failed to meet their burden.

■ The principal test of income tax liability is control or command over the property received. As the court stated in *Corliss v. Bowers,* 281 U.S. 376, 378, 50 S.Ct. 336, 337, 74 L.Ed. 916 (1930), "The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." *See also Burnet v. Wells,* 289 U.S. 670, 678, 53 S.Ct. 761, 77 L.Ed. 1439 (1933); *Helvering v. Horst,* 311 U.S. 112, 118–119, 61 S.Ct. 144, 85 L.Ed. 75 (1940).

■ When a controlling stockholder-officer diverts corporate money to his personal control, that money is taxable as a constructive dividend. *Dawkins v. Commissioner,* 238 F.2d 174, 178 (8th Cir. 1956); *Hartman v. United States,* 245 F.2d 349, 352–353 (8th Cir. 1957).

Here, funds in the Swiss bank accounts belonged to the taxpayers personally and not to their corporations. Although the taxpayers chose to invest some of those funds in USTC by paying some of USTC's bills, the taxpayers could and did spend much of it for their own use; they invested more than $4 million in real estate and securities in the United States.

The taxpayers considered the Swiss bank accounts as their personal accounts. Stonehill and Brooks had separate accounts which were under their individual control. In correspondence, they referred to these accounts as "my account". Stonehill, his wife, and his father executed signature cards which were placed in a sealed envelope and left with bank officials in New York so that in an emergency his wife or father could dispose of securities which Stonehill had purchased with funds from the Swiss accounts.

I find that the money in the Swiss bank accounts belonged to the taxpayers personally.

The taxpayers contend that any money in the Swiss accounts found to belong to them was money that they had before the beginning of the tax years. They failed to prove it.

The taxpayers next contend that part of the money in the Swiss bank accounts came from the repayment by USTC of the 10 million pesos used to obtain the barter permit. Assuming that to be true, the taxpayers, after being credited with $3 million [20] for that repayment, failed to account for an additional $6 million which went into these accounts.

I hold that the Commissioner properly increased the taxpayers' investment in USTC by approximately $5 million, the amount the taxpayers expended for USTC in the United States through unofficial channels.

I also hold that the Commissioner's determinations of tax deficiencies, as modified by this opinion, are correct and not arbitrary. The Government is therefore entitled to judgments against the taxpayers for tax deficiencies.

### V. *Fraud*

The Commissioner assessed fraud penalties of 50 per cent of the taxpayers' tax deficiencies.

■ "If any part of any underpayment . . . of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. . . ." 26 U.S.C. § 6653(b). "The burden is on the Commissioner to establish by clear and convincing evidence that at least some part of the deficiency was due to fraud." *Clark v. Commissioner,* 266 F.2d 698, 717 (9th Cir. 1959).

The taxpayers assert that, even if they failed to report and pay taxes on substantial amounts of income, the Government did not prove that this failure was the result of their wilful attempt to evade taxes. I disagree.

During the tax years, both Stonehill and Brooks opened and maintained a number of

---

20. The black market equivalent for 10 million pesos.

Swiss bank accounts, several in the names of Liechtenstein establishments or limited companies organized to conceal the fact that they were the real depositors. Whenever one of these Liechtenstein entities became known as a vehicle for the taxpayers, they dissolved that entity and transferred the assets to a new one which they organized.

The taxpayers sent money to these Swiss accounts from the Philippines through black market currency channels. They also sent money from UNY, which was realized from freight differentials and commissions. During the tax years, they sent more than $9 million to Swiss accounts. They later used some of this money to pay bills for USTC. They also used the money to buy real estate and securities for themselves in the names of United States corporations which they organized and which they used to conceal the source of some of the funds.

 The taxpayers engaged in elaborate, devious and complicated transactions through business entities often organized by persons whom the taxpayers arranged to front for them. They also engaged in the other activities described in earlier portions of this opinion. The taxpayers admit that they engaged in many of these activities to evade Philippine currency restrictions and perhaps even Philippine taxes, but they deny that they attempted to evade United States income taxes. I do not believe that their actions can be so limited. I hold that the Government established by clear and convincing evidence that the taxpayers wilfully attempted to evade income taxes due the United States government.

The following excerpt from *Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943), is particularly appropriate here:

Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished "in any manner". By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime.

The Commissioner properly assessed and added to the amount of taxpayers' deficiencies fraud penalties of 50 per cent of these tax deficiencies.

## VI. *Conjugal Property*

During the tax years, the wife of each of the taxpayers was a Philippine citizen. The taxpayers' wives, who were joined as defendants in this action, assert interests in the property which the Government seeks to foreclose here.

The wives contend that this property, which their husbands acquired during their marriage, is conjugal property [21] and that the husbands' tax liabilities cannot be satisfied out of the wives' share of the conjugal property.[22] Specifically, they assert that, as

**21.** The parties here acknowledge that Philippine community property law is based on "conjugal partnership of gains" and that community property is called "conjugal property".

**22.** The wives contend that some of the property is their "exclusive property", Civil Code Ann., Art. 148, because it is registered in their names. I disagree. Any property acquired

during marriage with conjugal funds remains conjugal property no matter which spouse is recorded as the owner. *Romero de Pratts v. Menzi & Co. and Sheriff of Rizal,* 53 Phil. 51 (1929). The wives do not contend that any of the conjugal property was bought with funds that they had before they married the taxpayers or which they acquired by inheritance or gift.

**64**

Philippine citizens, they do not owe any United States income taxes and that the taxes which their husbands owe are personal rather than conjugal debts. I disagree.

Article 161 of the Philippine Civil Code Annotated (Padilla 6th ed., 1971) provides: "The conjugal partnership shall be liable for: (1) all debts and obligations contracted by the husband for the benefit of the conjugal partnership. . . ."

 Under both this statute and Philippine case law, the debts incurred by a spouse while trying to increase the conjugal property are charged to the conjugal partnership, *Javier v. Osmena,* 34 Phil. 336 (1916), even if the other spouse opposes the enterprise. *Abella de Diaz v. Erlanger & Galinger, Inc.,* 59 Phil. 326 (1933). As Scaevola, an eminent Spanish commentator, said: ". . . the legal rule that he who shares in the profits, must share in the losses, governs in all its extent; hence the supposition that the husband should pay [expenses incurred to produce income] out of his separate property and in return share the gains obtained with his wife, would be entirely absurd and contrary to all long established principles concerning a partnership." 22 Scaevola, Código Civil, p. 246 (1905); *de la Torre v. National City Bank of New York,* 110 F.2d 976, 979 n. 2 (1st Cir. 1940).

 The community property law of the State of Washington is substantially the same as that of the Philippines. *Helvering v. Campbell,* 139 F.2d 865, 870 (4th Cir. 1944). The Washington Supreme Court in *Hearron v. Severyns & Co.,* 159 Wash. 486, 488, 293 P. 458 (1930), said: "We have here, then, the familiar case of an act done by the husband in the interest of the community and from which it derived a direct benefit. In all such cases we have invariably held the community liable, and the cases on the subject are so numerous and the rule so familiar that we refrain from citing authority."

Here, the taxpayers' business enterprises during the tax years increased the conjugal property, and the wives shared in that increase. The taxpayers' United States income taxes are obligations incurred in connection with the acquisition of the additional conjugal property, and their tax liabilities may be satisfied from the wives' share of that property.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Counsel for both the Government and the taxpayers shall compute the taxes and penalties due the United States; they shall also submit a judgment in accordance with this opinion.