**In re Simon DAVID, Debtor.**

**In re Edyth DAVID, Debtor.**

**Samuel R. BIGGS, Chapter 7 Trustee, Plaintiff,**

v.

**SMITH BARNEY, INC., Defendant.**

**Bankruptcy Nos. LA91–69225TD, LA91–70840TD.**
**Adv. No. LA95–03287TD.**

United States Bankruptcy Court, C.D. California.

April 3, 1996.

---

Daniel J. McCarthy, Hill, Farrer & Burrill, Los Angeles, CA, for Plaintiff.

Adam R. Eaton, Orrick, Herrington & Sutcliffe, Los Angeles, CA, for Defendant.

## MEMORANDUM OF DECISION AND ORDER THEREON

THOMAS B. DONOVAN, Bankruptcy Judge.

This was an action to avoid alleged preferential transfers brought by Chapter 7 Trustee Samuel R. Biggs (the "Trustee") on August 5, 1994. The defendant, Smith Barney, Inc., is the successor in interest to Lehman Brothers, Inc., formerly known as Shearson Lehman Brothers, Inc. ("Shearson"). Both Shearson and Smith Barney are stockbrokers. On April 10, 1995, the court entered an order approving a stipulation to bifurcate the trial. The order:

(1) Bifurcated the trial so that the parties first might try the issue of whether each alleged preferential transfer was a "margin

payment" or a "settlement payment," under 11 U.S.C. § 546(e)[1]; and

(2) Reserved all other issues presented by the pleadings for subsequent trial.

After the trial on the first issue, having considered the testimony, documentary evidence, pleadings and arguments of counsel, the court concluded that judgment should be entered in favor of the defendant. The court's ruling was announced orally at the hearing. This memorandum will constitute the court's written findings of fact and conclusions of law.

## I.

### FINDINGS OF FACT

#### A. *Admitted Facts.*

The following facts were admitted by the parties:

An involuntary Chapter 7 petition for relief was filed against Simon David on March 25, 1991. An order for relief was entered, and that case was converted to one under Chapter 11. That case subsequently was reconverted to a Chapter 7.

On August 6, 1992, Samuel R. Biggs was appointed as Interim Trustee for the Chapter 7 estate of Simon David. Thereafter, Simon David's § 341(a) meeting of creditors took place on September 30, 1992. No other person was elected as a trustee for Simon David's Chapter 7 estate at that time. As such, Samuel R. Biggs, who at the time was acting as Interim Trustee, began to serve in his capacity as Trustee under § 702(d).

On April 5, 1991, an involuntary Chapter 7 petition for relief was filed against Edyth David, commencing Case No. LA91–70840RA. An order for relief was entered and that case was converted to one under Chapter 11 and later was reconverted to a Chapter 7.

On or about October 21, 1992, Samuel R. Biggs was appointed as the Interim Trustee for Edyth David's Chapter 7 estate. Edyth David's § 341(a) meeting of creditors has not yet occurred due to her alleged inability to attend. Accordingly, the Trustee continues in his capacity as Interim Trustee in Edyth David's Chapter 7 case.

On April 12, 1993, this court entered an order in the Simon David case, LA91–69225RA, substantively consolidating that case with the Edyth David case, LA91–70840RA. On April 9, 1993, a similar order was entered in the Edyth David case.

Smith Barney purchased part of Shearson's business. With respect to the alleged preferential transfers that are the subject of the complaint, Smith Barney is the successor in interest to Shearson.

Transfers were made by Edyth David into her Shearson brokerage account, as follows:

| Date of Deposit | Amount |
|---|---|
| 8/09/90 | $150,000 |
| 8/15/90 | 100,000 |
| 8/30/90 | 30,000 |
| **TOTAL** | 280,000 |

After considering the evidence relating to the disputed issues of fact, the court concludes that Smith Barney has proved the following by a preponderance of the evidence:

#### B. *The Disputed Deposits.*

During August 1990, Ms. David deposited three personal checks into her Shearson account. All three checks were received at Shearson's Beverly Hills branch in August 1990.

Check No. 6445, dated August 8, 1990, in the amount of $150,000, was credited to Ms. David's account on August 9, 1990.

Check No. 6420, dated August 13, 1990, in the amount of $100,000, was credited to Ms. David's account on August 15, 1990.

Check No. 6478, dated August 28, 1990, in the amount of $30,000, was credited to Ms. David's account on August 30, 1990.

None of the three checks was a transfer of money for the benefit of Shearson. All three checks were deposits of cash credited to Ms. David's account to be applied toward either (a) settlement of Ms. David's current securities purchases in her account (including mon-

---

1. All statutory references herein are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, except as otherwise specifically noted.

ey market mutual funds) or (b) margin debt in Ms. David's account.

## C. *The Debtor's Trading Activity.*

Ms. David was an active trader of securities as a Shearson customer. She purchased many different stocks and actively engaged in options trading in many different forms, including the buying and selling of puts and calls.

Ms. David's options trading activity exposed her to much higher levels of risk than she had cash and securities in her account to cover, and to accommodate this activity, her account also included a margin feature enabling Ms. David to borrow from the broker to cover her obligations to Shearson. Absent an ability to borrow on margin, Ms. David would not have been able to make many of the short options trades that she made, solely based on cash deposits by Ms. David into her account.

When put options in Ms. David's account were assigned against her, Ms. David was required by the terms of her options contracts to buy the optioned stock at the agreed upon price. That happened to Ms. David several times during August 1990, at considerable cost to Ms. David. As of July 29, 1990, Ms. David's account contained a number of securities positions, including both stocks and open options positions. Many of the options positions consisted of either short puts or calls. Short put transactions assigned to Ms. David in August 1990 required her to buy large quantities of stock from the assignor at the agreed price specified in the put contract. Pursuant to the terms of her options contract, Ms. David was required to make the purchase regardless of whether she had available cash in her account to pay for the securities.

As of July 30, 1990, Ms. David had a combined money fund and cash credit balance of $355,061.56 in her Shearson account. Her account activity during August 1990 is summarized as follows:

### Ms. David's August 1990 Money Fund And Cash Account Activity:

| | |
|---|---:|
| Opening combined money fund and cash: | $ 355,061.56 |
| Charges for securities purchased: | ( 1,211,707.79) |
| Proceeds from securities sales: | 310,501.46 |
| Dividends received: | 435.00 |
| Money funds earnings: | 812.57 |
| Checks deposited to the account: | 280,000.00 |
| Margin interest: | ( 88.70) |
| Balance at end of August: | ($ 264,985.90) |

### *Short Options Purchases Required Of Ms. David During August 1990*

During August 1990 most of Ms. David's purchases were the result of eleven short options positions that were assigned against her during the month that obliged her to purchase, at various times during the month, in varying lot sizes, the following securities:

6,600 shares of Digital Equipment Corp.;

1,600 shares of International Business Machines;

500 shares of MCA, Inc.; and

1,200 shares of MCI Communications.

The total dollar amount Ms. David owed for these required purchases was $838,253.44. Ms. David also purchased other securities during August 1990. In all, her August purchases totaled $1,211,707.79.

Based on the settlement dates of Ms. David's August 1990 purchases and sales, the disputed $280,000 was deposited by Ms. David into her Shearson account for the purpose of partially paying for the purchases (i.e., as settlement payments), meeting margin requirements for the purchases, and meeting margin requirements for the continuing short options positions in her account.

Taking into account (a) the sales of securities in the account, (b) dividend income, (c) money funds earnings, and (d) her deposit of $280,000, there were insufficient funds in the account to cover Ms. David's obligations. As a result, Ms. David owed Shearson money as of August 31, 1990. Indeed, during the fol-

lowing month, September 1990, the amount she owed, that is, her debit balance, increased to $548,050.43, and Ms. David also incurred interest charges of $1,487.97. Ms. David did not withdraw any cash or securities from her Shearson account during August 1990. Therefore, it must be concluded that Ms. David made the disputed deposits primarily for the purpose of making partial payments toward the purchase of more than one million dollars in securities, and the court so finds.

In addition, the evidence supports the finding that even if all the proceeds of Ms. David's deposits had not been necessary to cover Ms. David's purchases, her cash deposits to some lesser degree would have been necessary to maintain Shearson's margin requirements to support Ms. David's short options positions in the account.

### D. *Federal Reserve Regulation T.*

Under Federal Reserve regulations concerning margin accounts, commonly referred to in the securities industry as Regulation T, all sources of cash (cash on deposit, new deposits, dividends, interest and proceeds from sales of securities) in a brokerage account are combined and applied daily against payment requirements in the account, both for new purchases of securities and for margin maintenance requirements. *See, e.g.,* Sec.Reg. & L.Rep. (BNA) (1390 § 240.4(c)(1), 16,137) ("All transactions on the same day shall be combined to determine whether additional margin is required by the creditor"). For this reason, the disputed deposits here could be allocated, if necessary, to specific securities purchases or margin debt.

Under Regulation T, it is unnecessary to allocate Ms. David's deposits in this case as either settlement payments or margin payments because it can be concluded that the disputed $280,000 had to be applied either to settlement payments for individual securities purchased by Ms. David during August or to margin payments necessary to satisfy margin requirements in her account resulting from Ms. David's ongoing trading activity.

### E. *The Disputed Payments Were Settlement or Margin Payments.*

In the securities industry, deposits of cash are made by customers: (1) as settlement payments to pay for purchases of securities; (2) as margin payments to reduce margin debt in the account (regardless of whether required pursuant to a "margin call"); or (3) as support for anticipated withdrawals of cash from the account by way of check, credit card, federal wire or transfer for the customer's benefit.

Plaintiff contends that the transfers could not have been margin payments because Ms. David had sufficient credit in her account to support her trading activity. Plaintiff also contends that the transfers could not be margin payments because the defendant failed to produce convincing evidence that Shearson had made any "margin calls" on Ms. David's brokerage account. Plaintiff maintains that the transfers could not be settlement payments because the transfers were not paid dollar for dollar in settlement of a particular transaction or series of transactions.

The problem with plaintiff's position is that there is no evidentiary support for the conclusions that a margin payment must be a payment specifically demanded by the broker or that a settlement payment must match up dollar for dollar with a particular security purchase. The evidence here leads the court to the opposite conclusion: when deposits were made, they reduced Ms. David's obligations (1) to pay for securities purchased and (2) for any margin debt Ms. David owed to Shearson. As to margin debt, any available funds applied to margin debt also would have reduced Ms. David's ongoing interest costs, regardless of whether Shearson had demanded payment by issuing a margin call.

In the end, the court concludes that Ms. David's disputed deposits must have been either settlement or margin payments, as those terms are understood in the securities industry.

### II.

### *LEGAL ISSUES*

#### A. *Relevant Statutory Provisions.*

■ At the time this case was commenced, § 546(e) provided, in relevant part: "[T]he trustee may not avoid a transfer that is a margin payment, as defined in section

101(34), 741(5) or 761(15) of this title, or settlement payment, as defined in section 101(35) or 741(8) of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case...."[2]

Likewise, at the time this case was commenced, § 741(5) provided: " 'margin payment' means payment or deposit of cash, a security, or other property, that is commonly known to the securities trade as original margin, initial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency."

At the time this case was commenced, § 741(8) provided: " 'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."

### B. *The Disputed Payments Were Settlement And/Or Margin Payments.*

■ Plaintiff contends that the issue as to whether a payment into a margin account is a "margin payment" or a "settlement payment" is a question of fact, not a question of law and that the court should apply narrow definitions of "margin payment" and "settlement payment." The court must disagree: whether terms defined in a statute are broad or not obviously are questions of law. Moreover, plaintiff's contention that the terms "margin payment" and "settlement payment" should be narrowly applied is contrary to binding case law in this circuit as well as persuasive case law in other circuits.

■ The Ninth Circuit has established that the interpretations of "settlement payment" and "margin payment" as used in the statutes are questions of statutory construction. *In re Comark,* 971 F.2d 322, 324 (9th Cir.1992). Furthermore, the Ninth Circuit and other circuits have adopted "a broad definition of settlement payment." *Id.* at 326. The term "margin payment" also is

interpreted very broadly and includes any payment by the debtor to reduce a deficiency in her margin account. *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.,* 913 F.2d 846, 848 (10th Cir.1990), *reh'g denied* (Oct. 24, 1990).

■ The definition of "settlement payment" in § 741(8) is "extremely broad" and clearly includes anything that may be considered a settlement payment. *Id.* at 848 (citations omitted). The term "settlement payment" also may be used to describe payments made to settle a customer's account with her or his broker. "Settlement" is defined as the conclusion of a securities transaction when a customer pays a broker/dealer for securities purchased or delivers securities sold and receives from the broker the proceeds of the sale. *In re Kaiser Steel Corp.,* 952 F.2d 1230, 1238 (10th Cir.1991) *cert. denied,* 505 U.S. 1213, 112 S.Ct. 3015, 120 L.Ed.2d 887 (1992) (citation omitted).

The court agrees with plaintiff's contention that the terms "margin payment" and "settlement payment" do not include all payments into a margin account. For example, the court would be hard-pressed to find that a payment made to open an account with a stockbroker, prior to any trading, constituted a margin payment or a settlement payment. In essence, the plaintiff maintains that the payments at issue here did not constitute either margin payments or settlement payments because Ms. David had enough credit buying power in her account during the time in question to undertake the transactions without the necessity of making any of the deposits in issue. Unfortunately, plaintiff cites no authority for this position and has failed to point to convincing evidence in the record to support plaintiff's conclusion. The court has been unable to identify any evidence or legal authority to support plaintiff's position. The court is not persuaded by the plaintiff's reasoning as applied to the evidence in the case at hand.

---

**2.** Today, § 546(e) is substantially the same. It has been broadened to include references to definitions under § 101.

### C. Settlement Payments and Margin Payments to Shearson are Protected From Recovery by § 546(e).

Settlement payments or margin payments, the payments at issue in this case, are protected from avoidance by § 546(e) where the disputed funds were used to pay for the debtor's purchases of securities through a stockbroker or to reduce margin debt owed to a stockbroker.

Plaintiff contends that the defendant's failure to produce evidence of Ms. David's "equity position" in her account should lead to two inferences: (1) that Ms. David's buying power was sufficient to enable her to undertake the transactions at issue without requiring any of the payments in issue; and (2) this evidence would demonstrate that Ms. David was not obliged to make the three payments in issue here. In support of this position, the plaintiff relies on *United States v. Stonehill,* 420 F.Supp. 46, 58 (C.D.Cal.1976), *aff'd in part, reversed in part,* 702 F.2d 1288 (9th Cir.1983), *cert. denied,* 465 U.S. 1079, 104 S.Ct. 1440, 79 L.Ed.2d 761 (1984). *Stonehill* is neither applicable nor persuasive in the case at hand. That case involved an action instituted by the federal government to foreclose federal tax liens. The defendants were taxpayers who were United States citizens living in the Philippines. The defendants refused to testify, either by deposition or in person. The trial court concluded that a court may properly infer that a person's testimony would be unfavorable to his or her case when that person has special information relevant to his or her case and refuses to testify. *United States v. Stonehill,* 420 F.Supp. at 58. In the case at hand, plaintiff has not established that the missing information (available, arguably, in Smith Barney's records) concerning Ms. David's buying power would have changed the outcome. The issue is not whether Ms. David had buying power with Shearson in August 1990. Rather, the issue is: did Ms. David make preferential transfers in August 1990? Smith Barney proved that Ms. David had increased liabilities to Shearson in August 1990 and ended the month with a substantial debit balance in her account, but even if Ms. David had buying power at the time, that fact would not change the outcome on the record in this case. *Stonehill* is inapposite.

Plaintiff also argues that most of the courts that have decided cases under § 546(e) "quickly" have concluded that the transfers at issue were settlement payments because the cases referred to concerned readily identifiable transfers of securities. This court does not agree with plaintiff's suggestion that the courts which have addressed § 546(e) have done so in a cursory fashion, though this court agrees that the record of Ms. David's account and the transactions in it are not difficult to understand but are readily identifiable and understandable.

During August 1990, Ms. David purchased far more securities than she could pay for with the funds available in her Shearson account. Regardless of the exact date on which the disputed funds were physically deposited into Ms. David's account, her money, of necessity, was applied principally to settle her ongoing obligations to pay for securities purchased in her brokerage account.

In light of the Ms. David's ongoing options trading and growing margin debt balance during August 1990, the payments at issue also could be considered to be margin payments, to the extent any funds deposited by Ms. David were left over after settlement of purchase obligations and were available to be applied by the broker to Ms. David's margin debt obligations to Shearson. *In re Blanton,* 105 B.R. 321, 347 (Bankr.E.D.Va.1989). Any payment by Ms. David which was used to reduce a balance owing on her Shearson account would have constituted either a margin payment or a settlement payment under the circumstances present here, for purposes of the exception under § 546(e). *In re Blanton,* 105 B.R. at 347.

The explicit language of § 546(e) bars the Trustee from seeking to replace the $280,000 that Ms. David used to fund her trading activity with $280,000 of Smith Barney's money.

A broad interpretation of § 546(e) is consistent with the legislative intent behind § 546(e), to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions and to "minimize the displacement caused in the commodities and securities markets in the

event of a major bankruptcy affecting those industries." *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.,* 913 F.2d at 848 (citation omitted); *see also, In re Comark,* 124 B.R. 806, 817 (Bankr.C.D.Cal.1991) *aff'd,* 145 B.R. 47 (9th Cir. BAP 1992), ("[b]y enacting Section 546(e), in 1982, Congress sought to protect the entire securities market").

Ms. David's three disputed deposits totaling $280,000 into her investment account during August 1990 were settlement payments or margin payments and, by reason of § 546(e), are not recoverable by the Trustee from Smith Barney, Shearson's successor.

### CONCLUSION

Based upon the foregoing, Smith Barney is entitled to judgment in its favor on the complaint. Having so concluded, no other issues remain in this adversary proceeding. Accordingly, judgment should be entered for the defendant.